**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| **KATE ROGERS, ED.D,** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | **Civ. No. 5:25-cv-1500-XR** |
| **V.** | § | |
| | § | **JURY DEMANDED** |
| **ALAMO TRUST, INC., DAN PATRICK,** | § | |
| **DAWN BUCKINGHAM, REMEMBER THE** | § | |
| **ALAMO FOUNDATION, WELCOME** | § | |
| **WILSON, JR., & ESPERANZA ANDRADE** | § | |
| | § | |
| *Defendants.* | § | |

<u>**KATE ROGERS'S FIRST AMENDED COMPLAINT**</u>

Plaintiff Kate Rogers, Ed.D. files this First Amended Complaint against Defendants Alamo Trust, Inc., Dan Patrick, Dawn Buckingham, Remember the Alamo Foundation, Welcome Wilson, Jr., and Esperanza "Hope" Andrade. This Amended Complaint is filed as a matter of course without need for leave of Court because it is filed within 21 days of receipt of Defendants' Motions to Dismiss.

## I.    <u>INTRODUCTION</u>

1.     "If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989). Everyone—Republicans, Democrats, and all the parties in between—*say* they support this right to free speech and *say* it is critical to the preservation of our nation. Our first president George Washington, for example, said, "If the freedom of speech is taken away then dumb and silent we may be led, like sheep to the slaughter."  Over two hundred years later, our current President Donald J. Trump shared a similar

sentiment: "If we don't have free speech, then we just don't have a free country. It's as simple as that…. If this most fundamental right is allowed to perish, then the rest of our rights and liberties will topple just like dominoes one by one."[1] Our elected officials in Texas also *say* they are fierce supporters of free speech—Governor Greg Abbott says that "America was built on freedom of speech and healthy public debate" and Lieutenant Governor Dan Patrick *says*, "Freedom of speech is a God-given right, and protecting that right is a top priority for Texans."[2] Even the Alamo Trust *says* that it "recognizes and respects the First Amendment rights of individuals and groups to express their views."[3]

2.     But the true test of whether a person is a supporter of free speech is not whether they *say* they are a supporter, but whether they will support another person's right to express ideas and opinions that they find offensive, distasteful, and even vile. As Voltaire reportedly said, "I disapprove of what you say, but I will defend to the death your right to say it." Yes, that is the true test. Of course, this is not an easy test to pass.

3.     To be a true supporter of free speech, our government officials must know that the remedy for offensive speech is "more speech, not enforced silence." *Whitney v. California*, 274 U.S. 357, 377 (1927) (Brandeis, J., concurring). If government officials don't like what a citizen is saying about them or an issue, the remedy under the First Amendment is not to stop her by passing a law or terminating her employment, but to insert their contrary views into the marketplace of ideas. Plaintiff Kate Rogers files this lawsuit because Defendants terminated her employment as President and Chief Executive Officer of the Alamo Trust because they disagreed

---

[1] https://www.donaldjtrump.com/agenda47/president-donald-j-trump-free-speech-policy-initiative.
[2] https://www.ltgov.texas.gov/2021/08/11/lt-gov-dan-patrick-statement-on-the-passage-of-senate-bill-5-3/.
[3] https://www.thealamo.org/visit/visiting-tips/site-rules.

with ideas and statements she published about the Alamo and Texas politics in her capacity as a private citizen. Defendants' silencing of Rogers based on her speech is a plain and simple violation of the First Amendment.

4.    Kate Rogers believes that the Alamo should represent the best of Texas and of America: our freedom and liberty. For over four years, she successfully led the Alamo and implemented the Alamo Plan with poise and diligence. Rogers navigated a complex course that brought together General Land Office Commissioner Dawn Buckingham, Lieutenant Governor Patrick, San Antonio elected officials, and community members from diverse backgrounds to implement an Alamo Plan that tells the full story of the Alamo and Texas independence.

5.    But Rogers's leadership at the Alamo ended abruptly in October 2025, after Lieutenant Governor Patrick read a copy of her 2023 dissertation. Her dissertation, written as a private citizen in support of her Doctorate of Education, expressed her personal views about the role of the Alamo in bringing people together instead of tearing them apart by helping to reconcile different historical interpretations. Rogers's beliefs and speech so infuriated Lieutenant Governor Patrick and Commissioner Buckingham that they ignored the protections the First Amendment guarantees to citizen speech and directed the Board of Directors of the Alamo Trust to end Rogers's employment immediately. Then, when Rogers exercised her free speech rights again to speak publicly with *Texas Monthly* about the role of historical truth at the Alamo and her termination, the Alamo Trust and the Remember the Alamo Foundation retaliated against her by revoking their severance offer to Rogers. Defendants *say* they are supporters of free speech, but their actions say differently.

## II.    **PARTIES**

6.    Plaintiff Kate Rogers, Ed.D. ("Plaintiff" or "Rogers") is an individual residing in Bexar County, Texas.

7.    Defendant Dan Patrick is an individual who currently serves as Lieutenant Governor of the State of Texas. He can be served at The Capitol, Room 2E.13, Austin, TX 78711-2068 or 1400 N Congress Ave, Austin, Texas 78701. He is sued for damages in his individual capacity and for declaratory and injunctive relief in his official capacity.

8.    Defendant Dawn Buckingham, M.D. is an individual who currently serves as Commissioner of the Texas General Land Office. She can be served at 1700 N. Congress Ave., Austin, TX 78701-1495. She is sued for damages in her individual capacity and for declaratory and injunctive relief in her official capacity. The GLO's mission statement under Buckingham states, in relevant part, "The Texas General Land Office (GLO) improves the lives of every Texan by preserving our state's history, restoring and operating the Alamo . . . ."

9.    Defendant Alamo Trust, Inc., is a non-profit established under the authority granted to the General Land Office by Tex. Nat. Res. Code § 31.451. Alamo Trust was established and operates on behalf of the GLO for the purpose of preserving the Alamo, under which Alamo Trust is to manage the day-to-day operations of the Alamo and carry out the Alamo Plan. Alamo Trust paid 60% of Rogers's salary. The Alamo Trust is a partnership with the GLO and cannot operate except under its grant of authority. The Alamo Trust is defined by statute as a "governmental body." *See* Tex. Gov't Code § 552.003(1)(A)(xiv).  Alamo Trust can be served through its registered agent for service of process, Capitol Corporate Services, Inc. 1501 S. Mopac Expressway, Suite 220, Austin, TX 78746.

10.     Defendant Remember the Alamo Foundation is a non-profit Type 1 supporting organization of Alamo Trust, Inc. under Section 509(a)(3). Remember the Alamo Foundation is a partnership with the GLO and cannot operate except under its grant of authority. Remember the Alamo Foundation paid 40% of Rogers's salary and was jointly responsible with the Alamo Trust for setting the terms and conditions of Rogers's employment. Remember the Alamo Foundation can be served through its registered agent for service of process, Capitol Corporate Services, Inc. 1501 S. Mopac Expressway, Suite 220, Austin, TX 78746.

11.     Welcome Wilson, Jr., is Chair of the Alamo Trust Board of Directors. He can be served at the Welcome Group, 515 Post Oak Boulevard, 12th Floor, Houston, TX 77027, or 5858 Westheimer Road, Suite 8000, Houston, Texas 77057.

12.     Esperanza "Hope" Andrade was Treasurer of the Alamo Trust Board of Directors until Rogers's termination, when she was appointed as President and CEO of the Alamo Trust. She can be served at 300 Alamo Plaza, San Antonio, Texas 78205.

13.     The Alamo Trust, Inc., the Remember the Alamo Foundation, and the individual Board members are regularly referred to in this Complaint collectively as the "Alamo Trust and Board."

### III.     JURISDICTION AND VENUE

14.     This case is brought under 42 U.S.C. § 1983.

15.     This Court has jurisdiction over this matter according to 28 U.S.C. § 1331 and 28 U.S.C. § 1343, and 42 U.S.C. § 1983.

16.     Venue is proper in this district under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in the District.

## IV.    FACTUAL ALLEGATIONS

A.    **"Remember the Alamo": A Rallying Cry for Texan Liberty and Freedom Defined By Statute and Contract**.

17.    The Texas Legislature has codified certain truths about our beloved Alamo: "[T]he Alamo has played an important role in the history of this state and continues to be a symbol of liberty and freedom for this state." Tex. Nat. Res. Code § 31.450(a)(1). Texas "wants to honor the individuals whose lives were lost at the Alamo." Tex. Nat. Res. Code § 31.450(a)(2). "[T]he entire history of the Alamo, from the time the Alamo was established as a mission until the present, should be recognized." Tex. Nat. Res. Code § 31.450(a)(3). "[T]he Alamo is a world-class destination that provides a place of remembrance and education." Tex. Nat. Res. Code § 31.450(a)(4).

18.    To realize these legislative priorities, the State of Texas placed the "Alamo complex under the jurisdiction of the [General Land Office]. The land office is responsible for the preservation, maintenance, and restoration of the Alamo complex and its contents and the protection of the historical and architectural integrity of the exterior, interior, and grounds of the Alamo complex." Tex. Nat. Res. Code § 31.451(a). "Any power or duty related to the Alamo complex formerly vested in any other state agency or entity is vested solely in the land office." Tex. Nat. Res. Code § 31.451(b).

19.    These priorities have been established law since 2011, when the Texas Legislature voted to phase out the Daughters of the Republic of Texas from managing the Alamo and transfer control to the General Land Office ("GLO"). In 2015, the GLO officially cut ties with the Daughters of the Republic of Texas. A GLO spokesperson insisted the termination would not result

in the "privatization of the Alamo." Instead, the GLO's own oversight and the Alamo Endowment Board[4] would prevent any privatization.[5]

20.    In 2018, the GLO entered into a Ground Lease and Management Agreement with the City of San Antonio. Under the Lease, the City leased the Alamo Plaza and associated streets to the GLO for the purpose of carrying out the Alamo Plan. The Lease requires the GLO to "provide high quality programming and services that enhances [sic] the historic and cultural significance of the site. GLO will uses its best efforts to tell the full story of the Texas revolution and the Battle of the Alamo, the whole history of the Alamo and work with all traditional groups that have historical or cultural ties to the Premises, for example but not limited to Tejano, Indigenous, and Texian groups, to provide programming consistent with the vision of the Alamo Plan." Section 6.02(b).

21.    The Alamo Plan states: "The story of the Alamo is world renowned and represents the core of Texas' identity today. The ongoing effort to restore dignity and reverence to this sacred historic site through the comprehensive Alamo Plan is underway through the following three pillars: (1) *preserve* the 300-year-old Church and Long Barrack; (2) *recapture* the original mission site and battlefield footprint; (3) *create* a world-class Visitor Center and Museum to tell the full history of the site" (emphasis in original).[6]

22.    According to the Alamo Trust, visitors to the Alamo can "[u]ncover 300 years of history at the Alamo, an awe-inspiring story that's more intriguing than you might imagine. Established in 1718 as Mission San Antonio de Valero, the former mission now known as the

---

[4] The Endowment Board transitioned in 2019 to become part of the Alamo Trust, Inc.
[5] Patrick Svitek, *Who Steps In After Alamo Management Shakeup?* The Texas Tribune, March 13, 2015, *available at* https://www.texastribune.org/2015/03/13/alamo-shakeup-turns-search-new-managers/.
[6] https://www.thealamo.org/support/alamo-plan (last accessed Nov. 7, 2025).

Alamo has been a crossroads of history. Having existed under five flags of independent nations and served as a garrison for five different armies, the Alamo has a rich history and a heritage to inspire. Best known as the site of the 1836 Battle of the Alamo, the rest of the 300 year history is vital to understanding why the Battle happened and its importance."[7]

**B.    Dr. Kate Rogers, A Respected Leader with a Long Career of Public Service, Is Hired to Implement the Imperiled Alamo Plan.**

23.    In 2021, the Alamo Trust hired Kate Rogers as its Executive Director to assist in carrying out the Alamo Plan. Rogers was a longtime executive at H-E-B, and she also performed leadership roles in local non-profits and with the Charles Butt Foundation. As Vice President of Community Outreach & Engagement at the Foundation, she facilitated community collaboration and alignment to drive systemic change. Rogers was hired at a critical time in the implementation of the Alamo Plan—the public did not support the architectural plans for the Alamo Plaza, and the Texas Historical Commission had just voted not to relocate the Cenotaph over public protest from both sides. As *Texas Monthly* reported in 2023, by 2020 "[t]he Cenotaph, along with the redevelopment of the Alamo and the reinterpretation of history it portended, morphed into a proxy Republican political battle." Then-Land Commissioner George P. Bush was accused of turning the Alamo into "a politically correct theme park."

24.    Rogers's experience as a diplomat was critically needed to bring the Alamo Plan to fruition. "Kate is a business leader and a change agent," Welcome Wilson Jr., Chair of the Alamo Trust, Inc. Board of Directors, said. "She is the kind of leader the Alamo needs right now, and we

---

[7] https://www.thealamo.org/remember (last accessed November 7, 2025).

are so excited to welcome her to the team. She brings a level of know-how, skills and grit to the position that will be invaluable to completing the Alamo Plan."

25.    Rogers's hiring was praised by local leaders as well. Then-Mayor Ron Nirenberg called her an "excellent choice" with "important experience and a proven record of leadership." Then-County Judge Nelson Wolff said, "They couldn't have hired anybody better" for the Alamo Trust role: "She has a good background, has a lot of connections, knows everybody in town, so I think she'll do a great job there."

26.    And Rogers did an excellent job. By 2024, $400 million dollars in funding was allocated in the state budget for the Alamo Plan. Rogers secured tens of millions in funding from the City of San Antonio, Bexar County, and private donors. Rogers also navigated a complex political climate. Her role required her to work with groups who downplay the role of slavery in the Texas Revolution and representatives from Indigenous groups and the African American community, who object to the Alamo mythology that prioritizes the Texian experience during the battle. Rogers performed this nuanced work extremely successfully, earning praise from all sides. "We were at the table, there was progress, people were listening," Ramon Vasquez, a member of the Tāp Pīlam Coahuiltecan Nation and executive director of American Indians in Texas, told *Texas Monthly*. "There was an authentic movement to hear and to create an opportunity for the full narrative of the Alamo to be told." Stephen Harrigan, a *Texas Monthly* writer and historian who was hired to write the explanatory text panels for the new museum and visitor center, told the magazine, "In my experience Kate is an exemplary and even-handed leader. Not very many people—maybe not anyone—could have charted the course she did through the turbulent political waters that have roiled this project from its inception. Texas owes her a big debt."

27.    On December 7, 2023, Commissioner Buckingham's senior staff texted Rogers, "Kate you are ROCKING it!!" Another staff member added, "Jerry Patterson called me on his drive home and was fired up about you haha. Said he was thoroughly impressed . . . ." Commissioner Buckingham also praised Rogers: "Heard today was tough, but you were tougher! Great job!"

28.    Rogers also worked successfully for many years with local leaders (who are primarily Democrats) and with statewide Republicans like Commissioner Buckingham and Lieutenant Governor Patrick. In 2024, Lieutenant Governor Patrick boasted, "God brought together this puzzle of people from different walks of life, of different political parties, and we came together at the right time." He continued that it was worth spending $400 million in state funds "into what the story is really all about, and that's the fight for liberty and freedom and independence."

29.    The Alamo Trust and Board gave Rogers a glowing evaluation in June 2025. Board Chair Welcome Wilson wrote, on behalf of the entire Board, "we want to extend our sincere thanks and appreciation for your outstanding leadership and the tremendous accomplishments achieved under your guidance at the Alamo. Your efforts in staffing, project management, educational programming, and enhancing the overall visitor experience have significantly elevated the impact and reputation of this treasured Texas institution. Kate, your vision for the Alamo's future continues to inspire and drive meaningful progress." The Board continued, "The successful realization of our strategic goals is a direct reflection of your dedication and constant oversight. . . . We are genuinely excited about the path ahead for the Alamo and are grateful to be on this journey with you."

30.     Because of Rogers's excellent stewardship, the Alamo Plan was on track, on schedule, and on budget.

**C.    The GLO and Lieutenant Governor Patrick Direct and Oversee Rogers and the Alamo Trust.**

31.     Make no mistake about it: the GLO calls the shots at the Alamo. The Alamo Trust operates only in partnership with the GLO and pursuant to a management contract between the two entities. Although the management contract purports to assign certain legal responsibilities only to the Alamo Trust, including the "sole right and obligation to conduct and control all aspects of the daily management, operations, communications, and marketing of the Alamo," the GLO and Commissioner Buckingham regularly demonstrate their complete control over daily operations at the Alamo. For example, Commissioner Buckingham created and organized a committee to manage and oversee the Alamo Church interpretation plan and initially did not include a single Alamo Trust employee or Board Member. Commissioner Buckingham and the GLO make daily management decisions, including regarding Alamo Trust employees, demonstrating that the management contract's attempt to vest sole control with the Alamo Trust is both a legal and practical fiction.

32.     Rogers's interview for the role of Executive Director was conducted by Alamo Trust board members and by Hector Valle, senior deputy director of the GLO. Rogers's role originally reported to Valle as senior deputy director of the GLO. Commissioner Buckingham directed Rogers in her role at the Alamo Trust. For example, Commissioner Buckingham's July 11, 2023 correspondence warned, "I am concerned the ATIPC [ATI Preservation Committee] is clearly spending an inordinate amount of time focusing on things *we* should not be doing, rather

than on things that *we* should do. . . . *I want to be clear that the committee is advisory in capacity and the decisions will be made by the Heritage Division of the GLO*." (Emphasis added).

33.    Months after this letter, Commissioner Buckingham's general counsel, Jeff Gordon, warned Rogers that Commissioner Buckingham wanted Rogers to "straighten up and make [Commissioner Buckingham] happy." Commissioner Buckingham continued to have regular and consistent oversight over Rogers. Commissioner Buckingham communicated both directly and through her senior staff. Commissioner Buckingham also directed Rogers to give her family members, Trump cabinet members, and other officials personal tours of the Alamo. Commissioner Buckingham also demanded that the Alamo Trust get the approval of her scheduler before setting Alamo events.

34.    The GLO required Rogers to have a standing weekly meeting at 4 p.m. on Wednesday afternoons with Commissioner Buckingham, her Chief of Staff, the General Counsel for the GLO, the Director of the Heritage Division, and the head of the Government Relations Team. This weekly meeting started immediately after Commissioner Buckingham's swearing in and was generally conducted by video conference, but Commissioner Buckingham would also occasionally attend in person as well. Commissioner Buckingham required the Alamo Trust Chief Administrative Officer to submit an agenda each week before the meeting, and the GLO's General Counsel and Chief of Staff would review and revise the agenda and require the Alamo Trust to make changes to the agenda. The weekly meetings required by the GLO generally lasted between 30 minutes to an hour.

35.    In addition to the weekly meetings with Commissioner Buckingham and her staff, Commissioner Buckingham required that the Alamo Trust's Chief Financial Officer meet with the

GLO finance team every other week by video conference and every month in person. The GLO also used state resources to audit the Alamo, in addition to the Alamo's own audit that it shared with the GLO yearly.

36.     The Alamo's project management contractor produced a monthly project report for the Alamo Trust and the GLO. Each month, Commissioner Buckingham required that Rogers and other Alamo Trust employees meet with GLO high level staff to go through the project report line by line.

37.     The GLO's Chief of Staff and General Counsel attended every Board meeting of both the Alamo Trust and the Foundation.

38.     Commissioner Buckingham embedded a full-time GLO employee, George Jaramillo, at the Alamo Trust. According to Mr. Jaramillo's LinkedIn profile, his "work focuses on **managing the Alamo Shrine** and historic Mission restoration including its surrounding historic structures, providing key preservation needs and cultural management." *See* https://www.linkedin.com/in/george-jaramillo/ (last visited on Feb. 13, 2026) (emphasis added). Commissioner Buckingham insisted that Mr. Jaramillo be included in all meetings related to the Alamo Plan and also directed the Alamo Trust to ensure Mr. Jaramillo had an office next to Alamo Trust project managers.

39.     In 2023, Rogers and Commissioner Buckingham's chief of staff Adrian Piloto had frequent communications involving the eminent domain dispute with Moses Rose's Hideout, legislative issues involving the Alamo, and the Alamo's interactions with the San Antonio City Council. Commissioner Buckingham required her staff to be in continual contact with Rogers to direct her work at the Alamo. On October 3, 2023, for example, Commissioner Buckingham's

office texted Rogers, "Kate- I have gotten quite a few aggressive calls from today. Apparently the grassroots folks have taken notice that the Mexican soldiers are being honored at the Alamo [the Dia del Soldado event]." Rogers followed Commissioner Buckingham's instruction, stating, "It has been removed from the website and social media." Commissioner Buckingham's office then wrote, "Thank you for handling. Don't want any unnecessary uproar heading into special session." Following the cancellation of this event, the Living Historian responsible for its creation resigned from his position at the Trust. On another occasion, Commissioner Buckingham's staff stated that they needed to review the books available for purchase at the Alamo gift shop.

40.    Rogers also met with the Commissioner and her staff weekly and had to confer with them regarding design choices. On May 9, 2024, Rogers asked the staff group chat, "We are being told by THC that we should only pursue concrete [for the roof replacement for the Alamo Church] for schematic design but I know the Commissioner wants wood - we need to sign the work order to keep moving - what do you want us to do?" Commissioner Buckingham's staff responded, "I think you keep moving forward with a wood option as well. Commissioner is pretty adamant about that." After reviewing the plan, Commissioner Buckingham's staff continued, "She has already seen that and made it clear she's not letting THC staff have the last word. Need to proceed with wood options too." Commissioner Buckingham's staff also instructed, "Please no horse carriages on plaza." In responding to a text message from a constituent, Commissioner Buckingham forwarded Rogers the following in 2023: "Y'all are pouring some stupid ancient concrete pillar shit out front. My Alamo is a church Make it church. Please. We need it."

41.    Commissioner Buckingham also demanded to see drafts of the scripts for the visitor center and museum's interpretative plan. When Lieutenant Governor Patrick learned that

14

Commissioner Buckingham had access, he demanded that Rogers share the script with his office as well. Both Lieutenant Governor Patrick and Commissioner Buckingham required revisions to the script. In fact, Commissioner Buckingham objected to Lieutenant Governor Patrick's heavy involvement with the operations of the Alamo Trust.

42.    The power struggle between Commissioner Buckingham and Lieutenant Governor Patrick frequently placed Rogers in the middle of the two officials. For example, on June 16, 2025, Rogers texted Lieutenant Governor Patrick, "I cancelled the meeting for tomorrow and Dawn called asking why. I explained that there had been concerns raised about adding people to the committee this late in the game. She said that you have no jurisdiction over the Alamo and she expects the meeting to proceed as planned. I asked if she might want to give you a call to talk [it] through and she declined saying she didn't have anything to say to you. How would you like me to proceed? [Commissioner Buckingham] is not at all happy with me right now – 'he's not in charge of the Alamo, I am.' I'm so sorry to bother you with all of this nonsense." Lieutenant Patrick responded: "I will talk to her tomorrow or tonight"; "Cancel the meeting - you have the authority and I'll back you & the commission 100%"; "If she asks again tell her the [L]egislature has over 600 million invested in the Alamo and we have a right to have a say in that investment[.]"

**D.    Lieutenant Governor Patrick and Commissioner Buckingham *Say* They Support Free Speech, But Their Actions Say the Opposite.**

43.    In 2017, when Dawn Buckingham was a first-term Republican state senator from Lakeway, she filed a bill forbidding Texas public universities from "punish[ing] a student or employee in any manner for engaging in expressive activities." While that bill did not advance, by 2019 statewide leaders had taken up her cause. Then-Senator Buckingham was a coauthor on SB 18, which passed in 2019 and required that all outdoor spaces be designated as open forums for

public speech, and prohibiting universities from considering anticipated controversy when deciding whether to allow a speaker on campus. When Governor Abbott signed SB 19, he published a video of himself shaking his finger at the camera, stating, "Shouldn't have to do it, the First Amendment guarantees it. Now it's law in Texas."[8] He added on Twitter on April 2, 2019, "But it's crazy we have to pass a law to uphold the First Amendment."

44.     But, while Lieutenant Governor Patrick and Commissioner Buckingham *say* they support free speech, their actions say otherwise. In 2023, for example, Commissioner Buckingham's daughter was in the audience when a Texas A&M professor gave a guest lecture at the University of Texas Medical Branch. According to Commissioner Buckingham's daughter, who reported the remark to her mother, the professor made a remark criticizing Lieutenant Governor Patrick's response to the opioid crisis. Rather than remedy the speech he found offensive with more speech, the Lieutenant Governor sought to silence the speaker. Lieutenant Governor Patrick immediately requested that Texas A&M "look into" the professor's comments, and the professor was immediately "placed on administrative leave pending investigation re firing her." Commissioner Buckingham wrote on X that the professor's comment about Patrick "has no place in a lecture and is indefensible." Although the professor was eventually able to keep her job, Commissioner Buckingham's and Lieutenant Governor Patrick's attempt to silence speech that is critical of their actions as public officials undermines their claimed loyalty to free speech.

---

[8] Video available at https://www.youtube.com/shorts/61hlfR-mzgs

**E.    Dr. Rogers, In Her Role as a Citizen, Hopes the Alamo Can Bring People Together** in **Support of Freedom of Speech and Democracy**.

45.    While Rogers was serving as Executive Director of the Alamo Trust, she was also a graduate student, pursuing her Doctorate of Education from the University of Southern California. Rogers's doctorate was sought in her personal capacity.

46.    Rogers began her doctoral studies in 2020, before she became Executive Director of the Alamo Trust. The Alamo Trust did not fund or sponsor this degree in any way.

47.    Rogers wrote her dissertation over the course of three years, and she published it and was awarded her doctorate in 2023. The final document was over 100 pages. The topic Rogers selected for her dissertation was intended to define best practices for experiential learning offered for educators at museums and historic sites. The dissertation focused on four museums and historic sites, none of which was The Alamo or even located in Texas.

48.    The dissertation included a section entitled, "The Role of the Researcher," in which she reflected on her role in the analysis. The section began, "Perhaps the biggest dilemma for me as a researcher and the actual 'instrument' in this qualitative study had to do with my own political views and my current environment."

49.    Rogers's dissertation made two personal statements about her role as a citizen and scholar. First, "Philosophically, I do not believe it is the role of politicians to determine what professional educators can or should teach in the classroom. Instead, teachers should be afforded the autonomy to make those decisions based on their own expertise as well as the needs of their students." This statement had nothing to do with the Alamo or with Rogers's role with the Alamo Trust. Instead, it dealt only with her opinions on whether politicians or educators should be able to decide how to teach students in public schools.

50.     Second, Rogers described how her role as Alamo Trust Executive Director positioned her between state political leaders—Lieutenant Governor Patrick and the GLO—and local political and interest groups. Rogers noted that San Antonio officials "do not agree with the state's emphasis on the Battle as the main focus of the future Visitor Center and Museum." After describing this tension, Rogers concluded, "Personally, I would love to see the Alamo become a beacon for historical reconciliation and be a place that brings people together versus tearing them apart, but politically that may not be possible at this time." In other words, Rogers's dissertation expresses her personal belief that the Alamo Plan should recognize the very ideas that the Texas Legislature codified in the Natural Resources Code:

   a.   "the Alamo has played an important role in the history of this state and continues to be a symbol of liberty and freedom for this state";

   b.   Texas "wants to honor the individuals whose lives were lost at the Alamo";

   c.   "the entire history of the Alamo, from the time the Alamo was established as a mission until the present, should be recognized"; and

   d.   "the Alamo is a world-class destination that provides a place of remembrance and education."

Tex. Nat. Res. Code § 31.450(a).

51.     Despite Rogers's nuanced and careful analysis in support of her Doctorate of Education, which was written fully and solely in her role as a student and a citizen, Defendants used Rogers's words against her more than two years later to oust her as President and CEO of the Alamo Trust.

18

**F.  Lieutenant Governor Patrick and Commissioner Buckingham Transform the Alamo from the "Cradle of Liberty" to a Graveyard of Censorship in Just Eleven Days.**

52.    The fighters at the Alamo courageously held off Santa Anna's troops for thirteen days. But Lieutenant Governor Patrick and Commissioner Buckingham only needed eleven days to lay siege to the First Amendment. On Monday, October 13, 2025, the Alamo's X account issued two statements: the first said, "Today, we honor Indigenous Peoples and their communities, recognizing their history at the Alamo. Opening in 2027, the Alamo Visitor Center and Museum will feature an Indigenous Peoples Gallery, celebrating the bands, clans and tribes that shaped the region. #IndigenousPeoplesDay." After this post, Commissioner Buckingham's chief of staff, Adrian Piloto, called the Alamo Trust's communications director to complain about the post. The communications director promised that he was about to post a second statement recognizing Columbus Day, which he soon did. Piloto allowed both posts to remain online.

53.    However, the following day, Commissioner Buckingham herself posted on X, "I did NOT authorize this post. This is frankly unacceptable and it has been deleted. Woke has no place at the Alamo." Commissioner Buckingham noted that the GLO would be "holding those responsible accountable and will be implementing a new process to ensure my office has oversight." Commissioner Buckingham also sent a publicly posted letter to the Alamo Trust Board, dated October 15, 2025, asserting that the post was "misaligned with the culture of The Alamo. . . . This blatant disregard of the battle-centric focus of The Alamo, that most Texans expect – the *liberty or death* history, must be addressed immediately."

54.    Perhaps Commissioner Buckingham would not have objected to the X post if it had referenced Indigenous People's *Week* instead. In 2021, Commissioner Buckingham voted to approve House Concurrent Resolution No. 62, which states, "Today, the Lone Star State is home

to Native Americans from diverse tribal nations, and the effort to retain ancestral memories, languages, and cultures is ongoing and vital; the observation of Indigenous Peoples' Week raises awareness of this rich heritage and the wide-ranging contributions Native Americans have made and continue to make to our state and nation; now, therefore be it RESOLVED That the 87th Legislature of the State of Texas hereby designate the second week in October as Indigenous Peoples' Week." It's odd that then-Senator Buckingham would support the designation of a full week to recognize Indigenous peoples but would be so bothered a few years later as Land Commissioner by the Alamo recognizing Indigenous peoples on a single day (particularly when it is undisputed that Indigenous peoples built the mission that we now call the Alamo).

55.    During an October 15 board meeting, the Board informed Rogers, "The state is too upset about this. Someone is going to have to pay." Rogers offered to resign. The Board refused to accept her resignation and informed Rogers that they would not even consider it. Based on Commissioner Buckingham's public statements and to appease her, the Alamo Trust Board voted to terminate the communications director on October 15, 2025 and to replace the writer responsible for drafting the script for the Alamo Visitor Center and Museum.

56.    On October 16, Wilson wrote to Commissioner Buckingham and confirmed that the Alamo Trust and Foundation were "taking strong corrective action to address the issues you raised. These include: . . .

- Implementing stricter oversight measures to ensure all messaging reflects the historic, cultural, and patriotic values of The Alamo.

- Providing the [GLO] with direct involvement in the content review processes moving forward.
- Ensuring that all personnel involved in communications are properly trained and aligned with the mission and standards you have articulated."

Wilson then recognized that the Alamo Defendants would lose control of the Alamo without state support: "The Board . . . fully understands that the Alamo Plan would not have come to fruition but for the aid of our great State of Texas." Nevertheless, as of October 16, the Board "continues to have full confidence in the ATI leadership team," demonstrating that the Alamo Defendants still fully supported Rogers in her position. Finally, Wilson wrote, "Our Board is committed to restoring your confidence in our communication processes and messaging strategy as well as ensuring that future actions fully reflect *your vision* for this historic site." (emphasis added).

57.    But Lieutenant Governor Patrick and Commissioner Buckingham were not prepared to surrender or be appeased by the Alamo Defendants' attempts to ingratiate themselves. On the evening of Wednesday, October 22, Lieutenant Governor Patrick and his Chief of Staff Darrell Davila called Rogers. Lieutenant Governor Patrick began the call by saying, "I don't want to make this call." He then proceeded to tell Rogers that he had "found" her dissertation from over two years ago, "and it is not acceptable." He said that someone who cared about him had given it to him. Lieutenant Governor Patrick instructed Rogers, "I need you to resign. You need to resign." Lieutenant Governor Patrick instructed Rogers to make a public statement that her dissertation had "become a distraction."

58.    Rogers was confused about what in her personal dissertation could have caused Lieutenant Governor Patrick's concern. Rogers asked Lieutenant Governor Patrick for clarification, and he read portions of her dissertation aloud. Rogers was also confused about how her personal views, expressed in her personal dissertation, were a problem. Rogers had made similar statements that were publicly posted online in 2022 and 2023, and no one had ever expressed any concerns about them. One of those articles, published by the University of Southern

California's School of Education, made clear what Rogers meant in her dissertation about the Alamo becoming a "beacon for historical reconciliation": "'Teachers are on the frontlines of the culture wars in America,' said Rogers, whose work as executive director of the Alamo Trust in San Antonio involves broadening the story of Texas' beginnings, including reconciling conflicting views of the part slavery played in Texas' war for independence from Mexico in the 1830s." When Rogers declined to commit to resigning, Lieutenant Governor Patrick asked Rogers, "Are you going to say I called you?" Because Rogers was not willing to keep Lieutenant Governor Patrick's call a secret, Lieutenant Governor Patrick said, "Then I need to end the call."

59.     After Lieutenant Governor Patrick's hung up on her, Rogers was distraught and spoke to two Alamo Trust senior staffers and Board Treasurer Hope Andrade that evening. Andrade pledged her support to Rogers and promised that the Board of Directors would stand behind her. However, on the morning of October 23, Lieutenant Governor Patrick called Andrade to pressure her to force Rogers to resign. Andrade then called Rogers, and reported that she had spoken directly with Lieutenant Governor Patrick, who read her portions of Rogers's dissertation. Andrade informed Rogers that Lieutenant Governor Patrick insisted that Rogers be terminated. Andrade instructed Rogers, "There's nothing I can do. You need to resign." Rogers asked, "What if I don't resign?" Andrade responded, "Then we will fire you." Andrade reported that she had talked to Board Chair Welcome Wilson and he agreed with the ultimatum. Rogers reminded Andrade that the night before she had promised that Rogers had the Board's support. Andrade told her that the State demanded Rogers's termination and that there was nothing the Board could do to prevent it. Andrade asked Rogers to issue a resignation letter immediately because the "State" wanted to issue a statement that day. Rogers and Andrade ended the call.

60.     Soon after, Lieutenant Governor Patrick tweeted two pages of Rogers's dissertation and a copy of the letter he sent to the Alamo Trust and Commissioner Buckingham. Lieutenant Governor Patrick's letter makes clear that Rogers's termination was based solely on Rogers's citizen speech in two pages of her dissertation. Lieutenant Governor Patrick wrote, "Her newly discovered written words were shocking to me and that's why I am passing them along to you. I believe her judgment is now placed in serious question and makes clear she has a totally different view of how the history of the Alamo should be told."

61.     Commissioner Buckingham endorsed Lieutenant Governor Patrick's decision to force Rogers's termination, writing on X, "I commend Lt. Governor Dan Patrick for his swift action at The Alamo. I appreciate The Alamo Trust Board and our continued work together bettering The Alamo." Moreover, Commissioner Buckingham and her office exchanged communications between October 13, 2025 and November 1, 2025 about Rogers which the GLO has sought to suppress from Public Information Act requests. Based on the GLO's representations to the Open Records Division of the Attorney General's Office, "the information at issue consists of communications between employees of the GLO and individuals with whom you state the GLO shares a privity of interest regarding . . . advice or recommendations on the policymaking matters of the GLO." On information and belief, the "individuals with whom" the GLO shares a privity of interest consist of the Alamo Defendants. In other words, not only were Commissioner Buckingham and the GLO discussing Rogers during the critical time period relevant to this lawsuit, but the GLO admits that these discussions with the Alamo Defendants demonstrated a privity of interest between the Alamo Defendants and the GLO regarding GLO policymaking.

62.     Because the GLO established, to the satisfaction of the AG's Open Records Division, that the GLO and the Alamo Defendants had "a privity of interest or common deliberative process with the third party," the AG's office permitted the GLO to withhold the policymaking discussions regarding Rogers. Critically, the AG noted, "[a] governmental body's policymaking functions do not encompass routine internal administrative or personnel matters," and instead include only "administrative and personnel matters of broad scope that affect the governmental body's policy mission." It is therefore clear that the GLO represented to the AG that the communications between the GLO and the Alamo Defendants not only discussed Rogers but also affected the GLO's mission.

63.     Lieutenant Governor Patrick and Commissioner Buckingham did not, and cannot, cite any example of how Rogers's personal scholarly views as expressed in her dissertation translated into poor job performance or performance that contradicted her obligations under state law or agreement. In fact, Rogers had made similar comments in 2022 and 2023 that were published online, and these comments not only did not negatively impact her excellent job performance but also never caused any controversy whatsoever. Therefore, Rogers was constructively terminated solely and exclusively for speech she made in her personal capacity as a citizen about a matter of public importance.

64.     Rogers was terminated for one reason, and one reason only: Lieutenant Governor Patrick and Commissioner Buckingham did not like Rogers's speech in her personal dissertation. Lieutenant Governor Patrick wrote in an October 28, 2025 opinion piece in the *San Antonio Express News*, the "fight for liberty and independence is why the Alamo is one of the most

recognized historic sites in the world."[9] Lieutenant Governor Patrick even admits that Rogers's dissertation is simply "her personal view." The Alamo cannot "remain a symbol of liberty and freedom for" Texas if Lieutenant Governor Patrick and Commissioner Buckingham use the Alamo to suppress the personal speech of anyone who disagrees with them. Otherwise, we need to change "Remember The Alamo" to "Remember The Alamo But Don't Say Anything About It That Upsets Texas Officials."

## G. Rogers Draws a Line in the Sand for the First Amendment and Refuses to Be Silenced.

65.    Following Rogers's forced resignation, Alamo Trust and its Foundation engaged in severance discussions with Rogers. However, Alamo Trust and its Foundation insisted that, as a condition of receiving these severance payments, Rogers agree to the following attempts to forever muzzle her: "you shall not respond to or participate in any public discussion or other publicity concerning or relating to your employment with, resignation or separation from Alamo Trust or your relationship with" Remember the Alamo Foundation and "you agree not to make any derogatory or negative comments about" the Alamo Trust, Remember the Alamo Foundation and "their parents, affiliates (including any elected officials or state and local governmental bodies affiliated with the Alamo), subsidiaries, directors, officers, employees, trustees, agents, stockholders, representatives, insurance carriers and/or attorneys."

66.    While Rogers was negotiating with Alamo Trust and Remember the Alamo Foundation, Rogers exercised her free speech rights under the First Amendment by sitting for an interview with *Texas Monthly*, who later published an article about Rogers's termination.

---

[9] Dan Patrick, *The 1836 Battle is the Focus of the Alamo Story*, San Antonio Express-News, Oct. 28, 2025, *available at* https://www.expressnews.com/opinion/commentary/article/dan-patrick-alamo-history-21122811.php.

Immediately after Alamo Trust and Remember the Foundation Board members learned that Rogers had exercised her free speech rights by talking with *Texas Monthly*, they retaliated against her again by withdrawing their severance offers and ceasing any further negotiations.

67.    A member of the Alamo Trust Board met with Lieutenant Governor Patrick and Commissioner Buckingham to attempt to re-commence severance negotiations. However, those efforts were unsuccessful. Lieutenant Governor Patrick directed the Alamo Defendants to cease severance discussions with Rogers following the Texas Monthly article because he believed it made him and the Alamo Defendants look "weak."

68.    In the article published by *Texas Monthly* ("'The Alamo Deserved Better': The Alamo CEO Forced From Her Job Speaks Out")[10] reporter Forrest Wilder included background about the dispute between Alamo traditionalists, who want to focus only on the battle itself, and other communities that support the Texas Legislature's requirement that the Alamo include background on the site's 300-year history.

69.    The article included the following quotes from Rogers:

a.    "It was a huge loss to me. I loved my job. I loved the work we were doing. I loved the people I was working with."

b.    "I wholeheartedly agree with Dan Patrick—politics does not have a place at the Alamo. It's our most treasured historic site, the Shrine of Texas Liberty. And what we tried to do, what I tried to do, was to keep politics at bay on both sides in terms of the extremes."

c.    "For me, this history is deeply personal and it does need to be told in a very authentic and factual way."

d.    "It would be hard to point to something that we did to suggest that we were trying to diminish the bravery and sacrifice of the men who fought

---

[10] Forrest Wilder, *"The Alamo Deserved Better": The Alamo CEO Forced From Her Job Speaks Out,"* Texas Monthly, Oct. 30, 2025, *available at* https://www.texasmonthly.com/news-politics/alamo-trust-kate-rogers-ouster/.

at the Alamo. Quite the opposite. The battle is the focus of the Alamo plan. But it's also about what led up to it, how did we get there, and then what happened after that."

e. "I remain incredibly optimistic that [the redevelopment plan] gets done. And it will be such a great thing for San Antonio and for our state. And I think in the end, despite all this, it will be something that everyone can be proud of."

70.    It is difficult to imagine which portions of Rogers's statements the Alamo Trust and Board objected to. Was it when Rogers agreed with Lieutenant Governor Patrick that politics should be kept at bay from both extremes? Was it how much Rogers loved her job? Was it her genuine wish that the Alamo Plan be fully executed? Regardless, one thing is clear: Rogers's decision to speak to a reporter as a citizen—a right that belongs to all Americans and one of the rights that the Alamo defenders gave their lives for—was so offensive to the Alamo Trust and Board that they withdrew their severance offer to Rogers. This decision was yet another retaliatory act to punish Rogers for exercising her free speech rights under the First Amendment.

## V.    FIRST CAUSE OF ACTION
### Violations of the First Amendment
#### *via 42 U.S.C. § 1983*

71.    The preceding paragraphs are incorporated herein for all purposes.

72.    Defendants violated Plaintiff's right to free speech guaranteed by the First Amendment to the United States Constitution as follows:

a. Defendant Buckingham directed and coerced Rogers's termination in retaliation for Rogers's speech as a citizen involving a matter of public concern, and directed and approved the withdrawal of Rogers's severance offer for Rogers's speech as a citizen involving a matter of public concern.

b. Defendant Patrick directed and coerced Rogers's termination in retaliation for Rogers's speech as a citizen involving a matter of public concern, and directed and approved the withdrawal of

Rogers's severance offer for Rogers's speech as a citizen involving a matter of public concern.

c. The Alamo Trust, Foundation, and Board Member Defendants constructively terminated Rogers's employment in retaliation for Rogers's speech as a citizen involving a matter of public concern and directed and approved the withdrawal of Rogers's severance offer for Rogers's speech as a citizen involving a matter of public concern.

73. Plaintiff's speech in her dissertation and to *Texas Monthly* following her termination involved matters of great public concern.

74. Plaintiff's speech in her dissertation and to *Texas Monthly* following her termination were made in her capacity as a citizen, not as an employee of the Alamo Trust or Foundation.

75. Plaintiff's speech in her dissertation and to *Texas Monthly* following her termination was not made pursuant to her official duties as an employee of the Alamo Trust or Foundation.

76. Plaintiff's interest in commenting on matters of public concern outweighs Defendants' interest in promoting efficiency. Plaintiff's speech was made over two years before Lieutenant Governor Patrick tweeted about it, demonstrating that Plaintiff's speech did not cause any disruptions at work or even in public. Moreover, Plaintiff had made similar comments in 2022 and 2023 that were widely available on the internet and never caused any disruptions at work or even in public.

77. Defendants' actions in causing Plaintiff's termination were motivated by Plaintiff's speech as a citizen. Plaintiff's discharge is legally considered a termination through constructive

discharge "if the employer gives the employee an ultimatum to quit or be fired." *Perret v. Nationwide Mut. Ins. Co.*, 770 F.3d 336, 338 (5th Cir. 2014).

78.    The aforementioned deprivations were done under color of state law, ordinance, regulation and custom or usage. Defendants are liable because their actions were committed while acting under the color of state law.

## VI.    SECOND CAUSE OF ACTION
### Conspiracy to Violate the First Amendment
#### *via 42 U.S.C. § 1983*

79.    The preceding paragraphs are incorporated herein for all purposes.

80.    The facts set out in this complaint establish a conspiracy to commit a 1983 violation of Plaintiff's First Amendment rights under 42 U.S.C. § 1983 for which all Defendants are jointly and severally liable.

81.    Defendants agreed and conspired to retaliate against Plaintiff for her exercise of her First Amendment rights by constructively terminating Rogers's employment because of speech Rogers made as a citizen on matters of public concern.

82.    Lieutenant Governor Patrick and Commissioner Buckingham directed and coerced the Board Members of the Alamo Trust and Foundation to terminate Rogers in retaliation for speech that Lieutenant Governor Patrick and Commissioner Buckingham did not like.

83.    Lieutenant Governor Patrick and Commissioner Buckingham directed and coerced the Board Members of the Alamo Trust and Foundation to withdraw Rogers's severance offer in retaliation for speech that Lieutenant Governor Patrick and Commissioner Buckingham did not like.

84.     The acts of Defendants were wanton, malicious, and done with the specific intent to deprive Rogers of her First Amendment rights and with the specific intent to cause substantial injury to Rogers.

85.     The aforementioned deprivations were done under color of state law, ordinance, regulation and custom or usage. Defendants are liable because their actions were committed while acting under the color of state law.

## VII.    STATE ACTION

86.     The preceding paragraphs are incorporated herein for all purposes.

87.     The aforementioned deprivations were done under color of state law, ordinance, regulation and custom or usage. Defendants are liable because their actions were committed while acting under the color of state law.

88.     Defendants Alamo Trust, Inc., Remember the Alamo Foundation, and the individual Board members are state actors because they were created and organized by the General Land Office.

89.     The Texas Government Code defines The Alamo Trust as a "governmental body." *See* Tex. Gov't Code § 552.003(1)(A)(xiv).

90.     Additionally, a private entity can qualify as a state actor for the purposes of 42 U.S.C. § 1983 under any of the following tests: (1) the public function test, (2) the state compulsion or coercion test, (3) the nexus or joint action test, and (4) the joint action or entwinement test.

91.     PUBLIC FUNCTION. Under the public function test, actions of a private entity are considered state action when the private entity performs a function "traditionally exclusively reserved to the state." Defendants' collaborative decision to force Rogers to resign was made in

the name of purportedly furthering the Alamo and the Alamo Plan. Preserving the Alamo and carrying out the Alamo Plan are functions which have been traditionally and exclusively reserved to the State on behalf of the people of Texas. The Alamo stands as a Shrine of Texas Liberty. According to the Alamo website, "The Alamo belongs to the people of Texas. In 2011, the Texas Legislature and Governor Rick Perry designated the Texas General Land Office the custodian of the Alamo on behalf of the people of Texas." The very nature of the Alamo renders preserving the Alamo and carrying out the Alamo Plan public functions that are traditionally and exclusively reserved to the state.

92.    In *Evans v. Newton*, the United States Supreme Court held that managing a municipal city park is public function, rendering it state action. 382 U.S. 296, 490 (1966). The Court highlighted that the park was like a fire department or a police department that traditionally serves the community. *Id.* at 490. Similarly, the Alamo serves the communities of San Antonio, Texas, and the United States. The Alamo is an integral part of City activities and is both public and municipal in nature.

93.    STATE COMPULSION/COERCION. Under the compulsion test, "a State normally can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the state." *Bass v. Parkwood Hosp.*, 180 F.3d 234, 242 (5th Cir. 1999) (citing *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982)). Here, Lieutenant Governor Patrick demanded that Rogers resign and implicitly or explicitly threatened Rogers and the Alamo Trust and Board that he would withdraw his support from the Alamo Plan if Rogers was not terminated. Between Lieutenant Governor Patrick and Commissioner Buckingham, they made clear that the

Alamo Trust and Board would face serious consequences if they did not oust Rogers. Lieutenant Governor Patrick and Commissioner Buckingham thus exercised coercive power and provided significant encouragement that Alamo Trust terminate Rogers's employment.

94.    <u>NEXUS/JOINT ACTION</u>. Under the nexus or joint action test, "state action may be found if, though only if, there is such a 'close nexus between the State and the challenged action' that seemingly private behavior 'may be fairly treated as that of the State itself." *Brentwood Acad. v. Tenn. Secondary Sch. Ath. Ass'n*, 531 U.S. 288, 295 (2001). Despite language in Section 3.4(a) and 3.5(a) of the Management Services Contract between the GLO and Alamo Trust Inc. that attempts to create a division between the GLO and the Alamo Trust, the relationship between Defendants and the laws of the State of Texas clearly indicate that Alamo Trust and Remember the Alamo Foundation may be fairly treated as the State itself. Alamo Trust and Remember the Alamo Foundation were created by GLO itself though the Land Commissioner for the purposes of serving the GLO by managing the Alamo.

95.    Further, Sections 31.451 (a) and (b) of the Texas Natural Resources Code vest the power over the Alamo "solely in the General Land Office." Section 31.451(d) authorizes the General Land Office to "partner with qualifying nonprofit organization . . . for the performance of any activity." Under Texas Law, the Alamo is partnered with Alamo Trust and Remember the Alamo Foundation for the purposes of carrying out the power and responsibilities related to the Alamo complex which are solely vested in the GLO. By this statute, Alamo Trust and Remember the Alamo are partners working toward a joint goal such that they must be considered joint actors.

96.    Additionally, under Fifth Circuit precedent, "Joint action requires 'an agreement or meeting of the minds between the state actor and the private actor to engage in a conspiracy to

deprive the plaintiff of a constitutional right, and that the private actor was a willing participant in joint activity with the state or its agents." *Pearson v. Shriners Hosps. for Children, Inc.*, 133 F.4th 433, 444 (5th Cir. 2025) (citing *Hernandez v. Causey*, 124 F.4th 325, 337 (5th Cir. 2024)). Here, the concerted effort among the Defendants evidences a clear conspiracy to force Rogers's resignation because of her citizen speech protected by the First Amendment.

97.    SYMBIOTIC RELATIONSHIP. Under the symbiotic relationship test, a private party will be considered a government actor where "the state has so far insinuated itself into a position of interdependence [with the private party] that it must be recognized as a joint participant in the challenged activity, which on that account, cannot be considered to have been so purely private as to fall without the scope of the Fourteenth Amendment." *Chrupcala v. Chester Cnty. Hosp.*, 2003 U.S. Dist. LEXIS 28727, 2003 WL 21088476, at *3 (E.D. Pa. Jan. 29, 2003) (citing *Burton v. Wilmington Parking Auth.*, 365 U.S. 715, (1961)).

98.    In *Burton*, the United State Supreme Court found that the city parking authority has a symbiotic relationship with the restaurant that leased part of the city parking authority's building. Federal courts have identified two critical factors from *Burton*: whether (1) the state profited from the shop's illegal practices, and (2) whether the shop was an indispensable part of a state project. *See Rendell-Baker v. Kohn*, 457 U.S. 830, 842-43 (1982); *Gallagher v. Neil Young Freedom Concert*, 49 F.3d 1442, 1451 (10th Cir. 1995); *Vincent v. Trend W. Technical Corp.*, 828 F.2d 563, 569 (9th Cir. 1987); *Frazier v. Bd. of Trs.*, 765 F.2d 1278, 1287 (5th Cir. 1985). Here: (1) the Alamo Trust is an indispensable part of the Alamo Plan, and (2) the State, specifically Lieutenant Governor Patrick, Commissioner Buckingham, and the GLO claim that the Alamo Plan would be

harmed by Rogers remaining at the Alamo Trust given her citizen speech. Accordingly, Defendants are state actors under *Burton's* symbiotic relationship test.

## VIII.  DAMAGES

99.    The preceding paragraphs are incorporated herein for all purposes.

100.    The damages suffered by Plaintiff include actual and compensatory damages for the injuries she suffered at the hands of Defendant, including, but not limited to, her economic damages, mental anguish and the emotional effects that the retaliation have had and continue to have on her.

101.    Further, because Defendants' actions were of the sort that render the imposition of exemplary damages appropriate, Plaintiff is entitled to an award of these damages.

## IX.  JURY DEMAND

102.    Plaintiff demands a trial by jury.

## X. CONDITIONS PRECEDENT/ADMINSTRATIVE REMEDIES EXHAUSTED

103.    All conditions precedent have been performed or have occurred, and all administrative remedies have been exhausted.

## X.  RELIEF REQUESTED

104.    Plaintiff requests this Court to enter a judgment:

    a.  Declaring the acts and practices complained of in this Complaint are in violation of the First Amendment;

    b.  Enjoining and permanently restraining these violations of the First Amendment;

    c.  Directing Defendants, including Defendants Patrick and Buckingham in their official capacities, to reinstate Plaintiff as President and Chief Executive Officer of the Alamo Trust, Inc.;

d.  Directing Defendants, including Patrick and Buckingham in their personal capacities, to pay Plaintiff actual and compensatory damages that she suffered, past and future, in amounts that have yet to be ascertained;

e.  Awarding Plaintiff exemplary and punitive damages based on the egregious violations Defendants committed;

f.  Awarding Plaintiff pre-judgment interest on amounts owed at the maximum rate allowed by law;

g.  Awarding Plaintiff the costs of this action together with reasonable attorneys' fees and expert witness fees;

h.  Awarding Plaintiff post-judgment interest on the amount of judgment until paid at the maximum rate allowed by law; and

i.  Awarding Plaintiff such other relief, legal or equitable, to which she may be justly entitled.

Respectfully submitted,

/s/ Lawrence Morales II
Lawrence Morales II
State Bar No. 24051077
lawrence@themoralesfirm.com
Allison S. Hartry
State Bar. No. 24083149
ahartry@themoralesfirm.com
**THE MORALES FIRM, P.C.**
6243 Interstate 10 West, Suite 132
Telephone No. (210) 225-0811
Facsimile No. (210) 225-0821

***ATTORNEYS FOR PLAINTIFF***

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was filed electronically with the Court and delivered by CM/ECF to all counsel of record on this 17th day of February, 2026.

/s/ Allison S. Hartry
Allison S. Hartry