| | | |
|---|---|---|
| **KATE ROGERS, ED.D,** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| | § | **Civ. No. 5:25-cv-1500-XR** |
| **V.** | § | |
| | § | **JURY DEMANDED** |
| **ALAMO TRUST, INC., DAN PATRICK,** | § | |
| **DAWN BUCKINGHAM, REMEMBER THE** | § | |
| **ALAMO FOUNDATION, WELCOME** | § | |
| **WILSON, JR., & ESPERANZA ANDRADE** | § | |
| | § | |
| *Defendants.* | § | |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS COMMISSIONER
BUCKINGHAM AND LT. GOVERNOR PATRICK'S MOTIONS TO DISMISS**

Plaintiff Kate Rogers ("Rogers") files this response to Defendants Commissioner Dawn Buckingham ("Commissioner Buckingham")'s and Lieutenant Governor Dan Patrick ("Lt. Gov. Patrick")'s Motions to Dismiss (DKT. NO. 21 and NO. 22):

## I. SUMMARY

After years of micromanaging the daily operations of the Alamo Trust, from its communications to its personnel decisions, Lt. Gov. Patrick and Commissioner Buckingham now argue that they have no power or control at the Alamo. The well-pleaded facts in Rogers's Complaint—which include the words of Lt. Gov. Patrick and Commissioner Buckingham themselves—show otherwise. Lt. Gov. Patrick and Commissioner Buckingham not only exert immense control over the Alamo Trust in general but they also forced the Alamo Trust to terminate Rogers after they learned about her allegedly "woke" personal dissertation. This governmental interference violated clearly established constitutional law. Any reasonable public official in the shoes of Lt. Gov. Patrick and Commissioner Buckingham would have known that forcing Rogers to resign based on her personal speech would violate the First Amendment—yet

1

they did just that, and they now seek to avoid legal responsibility for their constitutional violations. Because Rogers's Amended Complaint easily demonstrates both this Court's subject matter jurisdiction and valid causes of action for First Amendment retaliation and conspiracy, the Court should deny both Motions to Dismiss.

## II. STANDARD OF REVIEW

### A. Federal Rule of Civil Procedure 12(b)(1).

A motion to dismiss under Rule 12(b)(1) of the Federal Rules of Civil Procedure challenges a federal court's subject matter jurisdiction. Under Rule 12(b)(1), a court may only dismiss a claim for lack of subject matter jurisdiction when the court lacks statutory or constitutional authority to adjudicate the claim. *Home Builders Assoc. of Mississippi, Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998). At the motion-to-dismiss stage, a plaintiff is only required to allege facts that give rise to a plausible claim of her standing, and in assessing whether the plaintiff has met this standard, courts must take the well-pled factual allegations of the complaint as true and view them in the light most favorable to the plaintiff. *Barilla v. City of Houston*, 13 F.4th 427, 431 (5th Cir. 2021).

### B. Federal Rule of Civil Procedure 12(b)(6).

"[M]otions to dismiss under Rule 12(b)(6) are viewed with disfavor and are rarely granted." *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir. 2009) (citation omitted). The Court must "accept all factual allegations in the complaint as true" and "must also draw all reasonable inferences in the plaintiff's favor." *Id*. When considering a motion to dismiss for failure to state a claim, the court "is limited to the complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and

referenced by the complaint." *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010).[1]

### III.  ARGUMENTS AND AUTHORITIES

**A.  This Court Has Subject Matter Jurisdiction Over Rogers's Claims Against Commissioner Buckingham and Lt. Gov. Patrick.**

**1.  Rogers Has Standing to Pursue Claims Against Commissioner Buckingham and Lt. Gov. Patrick.**

To have Article III standing, Rogers must demonstrate (1) that she suffered an injury in fact that is concrete, particularized, and actual or imminent, (2) that the injury was caused by the defendants, and (3) that the injury would likely be redressed by the requested judicial relief. *Thole v. U.S. Bank N.A.*, 590 U.S. 538, 140 S. Ct. 1615, 1618 (2020). Both Lt. Gov. Patrick (DKT. 21 at 4-6) and Commissioner Buckingham (DKT. 22 at 8-16) move to dismiss on the second and third elements, traceability and redressability. Because Defendants' arguments ignore Rogers' allegations concerning their coercive interference concerning her ouster at the Alamo Trust, Rogers easily meets these requirements. Alternatively, if the Court considers facts outside the Complaint's allegations, Rogers requests that the Court convert Defendants' motions to dismiss into motions for summary judgment and permit discovery on these issues.

**a.  Rogers's Allegations Demonstrate a Causal Connection Between Lt. Gov. Patrick's and Commissioner Buckingham's Actions and Her Ouster.**

Traceability requires that a defendant's actions "have a 'causal connection' to the plaintiff's injury." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). Traceability does not require showing proximate cause; instead, the plaintiff need only allege facts that, if true, show

---

[1] This standard certainly does not permit Commissioner Buckingham to introduce an affidavit from a GLO employee on a minor issue mentioned in the Complaint regarding the close policymaking connection between the GLO and the Alamo Trust. (*See* DKT. NO. 22 at 10, 22-4). Defendants' hundreds of pages of exhibits demonstrate that dismissal is inappropriate based on the well-pleaded facts.

the defendant's actions produced a "determinative or coercive effect upon the action of someone else." *Bennett v. Spear*, 520 U.S. 154, 169 (1997). Indeed, the plaintiff's injury is traceable as long as her harm is a "predictable effect" of the defendants' actions. *See Dep't of Com. v. New York*, 588 U.S. 752, 768 (2019).

For example, in *Bennett v. Spear*, the Fish and Wildlife Service issued a Biological Opinion concluding that continued operation of an irrigation project would endanger certain fish. 520 U.S. at 166. Therefore, the Fish and Wildlife Service recommended that the Bureau of Reclamation make less irrigated water available for commercial use. *Id.* The Bureau followed the Biological Opinion's recommendation and two irrigation districts sued, alleging that the coercive impact of the Service's Biological Opinion caused them injury. *Id.* The federal government argued that the Biological Opinion was simply "advisory" and therefore that the irrigation districts' injury was not sufficiently traceable. *Id.* at 169. The Supreme Court disagreed, noting that the Biological Opinion "has a powerful coercive effect" that makes the irrigation districts' injury "fairly traceable" to the Biological Opinion.

Like in *Bennett*, Rogers's Amended Complaint includes sufficient allegations to demonstrate the "powerful coercive effect" Lt. Gov. Patrick's and Commissioner Buckingham's actions had on Rogers's ouster. Rogers includes detailed allegations in her Amended Complaint demonstrating that, until Lt. Gov. Patrick and Commissioner Buckingham intervened in October 2025, she was thriving as the Chief Executive Officer of the Alamo Trust and there was no indication whatsoever that the Alamo Trust was interested in terminating her employment or forcing her to resign. (DKT. 19 at ¶¶23-30). Indeed, in June 2025, Chair of the Alamo Trust Board Welcome Wilson praised Rogers: "we want to extend our sincerest thanks and appreciation for your outstanding leadership and the tremendous accomplishments achieved under your guidance at the Alamo." (*Id*. at ¶29). Yet, just a few months later in October 2025,

Alamo Trust Treasurer Hope Andrade told Rogers, "There's nothing I can do. You need to resign" and that, if Rogers did not resign, "Then we will fire you." (*Id*. at ¶59).

Rogers alleges that Lt. Gov. Patrick and Commissioner Buckingham caused this seismic shift in the Alamo Defendants' view of Rogers's employment and alleges that they directed, coerced, and conspired with the Alamo Defendants to terminate her employment because of Rogers's statements in her doctoral dissertation. (*Id*. at ¶¶59, 79-85). Specifically, Rogers alleges that, in October 2025, Commissioner Buckingham tweeted, "Woke has no place at the Alamo" and informed the Alamo Trust Board that any "blatant disregard of the battle-centric focus of The Alamo . . . must be addressed immediately." (DKT. NO. 19 ¶53). The Board recognized, "The state is too upset about this ['the blatant disregard of the battle-centric focus']. Someone is going to have to pay." (*Id*. at ¶55). The Board then terminated the Alamo Trust's Communications Director and the writer responsible for drafting the Museum's script, demonstrating the State's coercive power over staffing decisions at the Alamo.

Then, just days later, Lt. Gov. Patrick called Rogers and instructed her to resign. (*Id*. at ¶57). Although the Board originally appeared prepared to support Rogers's exercise of free speech in her dissertation, Andrade changed her tune after Andrade spoke to Lt. Gov. Patrick. Andrade told Rogers that the State demanded Rogers's termination and that there was nothing the Board could do to prevent it. (*Id*. at ¶59). Commissioner Buckingham then confirmed this state action by writing, "I commend Lt. Governor Dan Patrick for his swift action at The Alamo. I appreciate the Alamo Trust Board **and our continued work together bettering The Alamo**." (*Id*. at ¶61) (emphasis added). If Lt. Gov. Patrick did not have any authority to make personnel decisions at the Alamo Trust as Defendants claim in their Motions, then how was he able to take the "swift action at the Alamo" concerning Rogers's ouster for which Commissioner Buckingham publicly commended him? A plausible inference from Commissioner

Buckingham's X.com post and use of the possessive "our continued work" is that she was far from a mere observer in Rogers's forced resignation. These well-pleaded facts demonstrate a causal connection between Lt. Gov. Patrick's and Commissioner Buckingham's actions to satisfy the traceability element of standing.

The result is the same for the Alamo Defendants' decision not to pay Rogers a severance. First, Rogers alleges that Lt. Gov. Patrick participated in the Alamo Defendants' decision not to pay Rogers a severance following Rogers's interview with *Texas Monthly*. (DKT. 19 ¶67). Second, Rogers alleges that both Lt. Gov. Patrick and Commissioner Buckingham directed the Alamo Trust to take adverse actions against state employees after they engaged in speech the state officials disapproved of: Lt. Gov. Patrick's forced termination of Rogers, Commissioner Buckingham's forced termination of the Alamo Trust's Communications Director, and their collective efforts to terminate a Texas A&M professor because of his critical remarks about Lt. Gov. Patrick. (DKT. 19 ¶¶44, 53-64). The *modus operandi* of Lt. Gov. Patrick and Commissioner Buckingham is clear: an employee says something they do not like, and they then use their powers to coerce and pressure the relevant agency or department to take adverse actions against that employee.

Here, while the parties were engaged in severance negotiations, Rogers gave an interview with *Texas Monthly* that Defendants universally believed to have disparaged Lt. Gov. Patrick and Commissioner Buckingham. Based on Lt. Gov. Patrick's and Commissioner Buckingham's history of retaliation, it was probable, if not certain, that Lt. Gov. Patrick and Commissioner Buckingham would insist that the Alamo Trust withdraw Rogers's severance when they learned about the *Texas Monthly* article. Indeed, even the Alamo Defendants acknowledge that they withdrew her severance because Rogers "promised not to disparage elected officials associated with the Alamo while simultaneously disparaging them publicly." (DKT. 23 at 23). In other

words, although Rogers denies that she disparaged Lt. Gov. Patrick or Commissioner Buckingham, it is clear the Alamo Defendants were acting to prevent bad publicity for those state officials, which is a "predictable effect" of the state officials' coercing the Alamo Defendants to terminate Rogers. Therefore, Rogers's injuries are traceable to the actions of Commissioner Buckingham and Lt. Gov. Patrick in their official and personal capacities.

> **b.** **Rogers's Injury Would Be Redressed by A Court Order Enjoining Further First Amendment Violations by Lt. Gov. Patrick and Commissioner Buckingham.**

"To satisfy redressability, a plaintiff must show that 'it is *likely*, as opposed to merely *speculative*, that the injury will be redressed by a favorable decision.'" *Inclusive Cmtys.*, 946 F.3d at 655 (emphasis in original). "The specific form of relief sought must at least lessen the injury of which plaintiff complains, but it need not completely resolve it." *Reule v. Jackson*, 114 F.4th 360, 368 (5th Cir. 2024). The traceability and redressability elements "are closely related, and can be viewed as two facets of a single requirement." *Scenic Am., Inc. v. U.S. Dep't of Transp.*, 836 F.3d 42, 54 (D.C. Cir. 2016). "[A] plaintiff satisfies the redressability requirement when he shows that a favorable decision will relieve a discrete injury to himself. He need not show that a favorable decision will relieve his every injury." *Larson v. Valente*, 456 U.S. 228, 244 n.15 (1982).

The Supreme Court's decision in *Bennett v. Spear* also demonstrates why Rogers's injury will likely be redressed by a favorable decision against Lt. Gov. Patrick and Commissioner Buckingham. In *Bennett*, the Fish and Wildlife Service issued a Biological Opinion that led to reduced water being made available to the plaintiffs, two irrigation districts. *Bennett*, 520 U.S. at 169. Just as the Court concluded that the irrigation districts could show traceability based on the Biological Opinion's "coercive effect," the Court held that the districts demonstrated their injuries would likely be redressed if the Biological Opinion were retracted. *Id.* In support of this

outcome, the Court noted that the water districts had received water in the same manner for years until the Fish and Wildlife Service issued its Biological Opinion. As a result, the Court held, the districts met their "modest" burden to show that the districts' injury "will 'likely' be redressed—*i.e.*, the Bureau [of the Interior] will not impose such water level restrictions—if the Biological Opinion is set aside." *Id.* at 170-71.

Here, an injunction requiring the Alamo Defendants, along with Lt. Gov. Patrick and Commissioner Buckingham in their official capacities, to reinstate Rogers to her former position more than satisfies the redressability requirement. Rogers alleges that, until Lt. Gov. Patrick and Commissioner Buckingham intervened in October 2025, the Alamo Trust believed Rogers demonstrated "outstanding leadership" and had achieved "tremendous accomplishments." (DKT. 19 at ¶29). However, just as the Biological Opinion immediately changed the irrigation districts' water access, the coercive effect of Lt. Gov. Patrick and Commissioner Buckingham's intervention at the Alamo immediately led to Rogers's forced ouster. It is therefore far more than "likely" that including the state officials in any injunction would "at least lessen" Rogers's injury.

Moreover, if Rogers prevails, whether the Court orders reinstatement will depend on a variety of practical factors, including whether animosity between the parties makes reinstatement impractical. *See Palasota v. Haggar Clothing Co.*, 499 F.3d 474, 489 (5th Cir. 2007). Without Lt. Gov. Patrick and Commissioner Buckingham's inclusion in a reinstatement order, the Alamo Defendants will likely object that animosity from Buckingham and Patrick would prevent Rogers's successful reinstatement. Indeed, the Alamo Defendants have already made that argument, claiming that Rogers "bit[] the hand that fed the Alamo Plan" when she raised concerns about state interference at the Alamo and, by doing so, had "sealed her own fate." (DKT. 23 at 10). If, on the other hand, Lt. Gov. Patrick and Commissioner Buckingham are

enjoined from further First Amendment violations by interfering in Rogers's reinstatement, Rogers's injury would be lessened because the Alamo Defendants would not need to fear state intervention in or retaliation for their hiring decisions. Moreover, if it were not for Lt. Gov. Patrick and Commissioner Buckingham's interference at the Alamo Trust, the Alamo Trust would not have forced Rogers to resign. If the state officials can, as Rogers alleges, force the Alamo Trust to oust her, they can certainly force the Alamo Trust to reinstate her.

Defendants cite *Okpalobi v. Foster*, 244 F.3d 405 (5th Cir. 2001), in which abortion providers challenged the constitutionality of a Louisiana statute that provided women who undergo an abortion a *private tort remedy* against the doctors who perform the abortion. The only defendants were the governor and attorney general, who "have no authority to prevent a private plaintiff from invoking the statute in a civil statute" and therefore "have no powers to redress the injuries alleged." *Id.* at 426-27.

*Okpalobi* does not aid Defendants here because Lt. Gov. Patrick and Commissioner Buckingham exercised control over the day-to-day operations at the Alamo, such as:

- GLO senior officials conducted Rogers's interview and hiring (DKT. NO. 19, ¶31);

- Rogers initially reported to a senior official at the GLO (*Id*. at ¶ 39);

- Buckingham directed the Alamo Trust to terminate the employment of its Communications Director (*Id*. at ¶55);

- Buckingham insisted that the GLO have direct involvement in all content distributed by the Alamo (*Id*. at ¶¶ 55-56);

- Lt. Gov. Patrick instructed Rogers to resign and to make a public statement that her dissertation had become a distraction (*Id*. at ¶ 58);

- When Rogers refused to resign, Lt. Gov. Patrick instructed the Alamo Defendants to give her an ultimatum to either resign or be fired (*Id*. at ¶ 59);

- Commissioner Buckingham instructed Rogers to cancel an event at the Alamo (*Id*. at ¶ 39);

- Commissioner Buckingham required Rogers to meet with her and other GLO senior officials every week (*Id.* at ¶34);

- Commissioner Buckingham embedded a GLO employee who was "continuously on the situs" of the Alamo Trust offices, who describes his position as managing the Alamo Shrine (*Id.* at ¶38); *see Roberts v. La. Downs, Inc*., 742 F.2d 221, 224 (5th Cir. 1984) (holding that a private racetrack was a state actor when a government official was "continuously on the situs" of the racetrack);

- Commissioner Buckingham redirected the work and attention of Alamo Trust committees (*Id*. at ¶ 32);

- Commissioner Buckingham directed Rogers to give personal tours to Trump officials (*Id*.);

- Commissioner Buckingham's general counsel warned Rogers that she better "straighten up and make [Commissioner Buckingham] happy" (*Id*. at ¶ 33);

- Commissioner Buckingham created and organized a committee to manage and oversee the Alamo Church interpretation plan (*Id*. at ¶32);

- Commissioner Buckingham required the Alamo Trust's Chief Financial Officer to meet with GLO's finance team every other week (*Id*. at ¶ 35);

- Commissioner Buckingham required that Rogers and other Alamo Trust employees review a monthly project report line by line with high-level GLO staff (*Id*. at ¶ 36); and

- GLO's Chief of Staff and General Counsel attended every board meeting of the Alamo Trust and the Remember the Alamo Foundation (*Id*. at ¶ 37).

Without a court order to the contrary, it is plausible and likely that Lt. Gov. Patrick and Commissioner Buckingham would continue to interfere in Rogers's free speech rights and her employment at the Alamo Trust.

It makes no difference that the Management Services Contract between the GLO and the Alamo Trust and the Alamo Trust Bylaws purport to place all employment obligations on the

Alamo Defendants. "The State cannot avoid its constitutional responsibilities by delegating a public function to private parties." *Georgia v. McCollum*, 505 U.S. 42, 53 (1992). The Seventh Circuit, for example, has explained that in a prison setting, courts must look to the "trilateral relationship" between "the state, the health care provider, *and* the prisoner." *Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 826 (7th Cir. 2009) (emphasis in original). What matters is "state control," because the state is "the ultimate responsible party for the prisoner's health care . . . ." *Id.* Therefore, "if the government must satisfy certain constitutional obligations when carrying out its functions, it cannot avoid those obligations and deprive individuals of their constitutionally protected rights by delegating governmental functions to the private sector." *Id.* (quoting Martin A. Schwartz, 1 *Section 1983* Litigation Claims and Defenses § 5.14 [A] at 5-100 (4th ed. 2003). This is especially true here, where the GLO and Commissioner Buckingham herself regularly demonstrate their complete control over daily operations at the Alamo in total disregard for the terms of the Management Services Contract. (DKT. 19, ¶¶31-42).

Defendants' self-serving labels and descriptions of their relationship in the Management Services Contract and Bylaws do not control; instead, courts analyze the "substantive realities of the relationship," not mere forms or labels used by those seeking to avoid liability. *See Lindke v. Freed*, 601 U.S. 187, 197 (2024) ("The distinction between private conduct and state action turns on substance, not labels . . . ."); *Watson v. Graves*, 909 F.2d 1549, 1554 (5th Cir. 1990) ("We must . . . look to the substantive realities of the relationship, not to mere forms or labels ascribed to the laborer by those who would avoid coverage.").[2] The allegations in Rogers's Amended Complaint show that the Management Services Agreement is mere window dressing. Despite

---

[2] *See also Brentwood Acad.*, 531 U.S. at 295 (2001) (stating it is "unequivocal" that "the character of a legal entity is determined neither by its expressly private characterization in statutory law, nor by the failure of the law to acknowledge the entity's inseparability from recognized government officials or agencies."); *West v. Atkins*, 487 U.S. 42 (1988) (same result for private physician providing medical services under contract with state prisons); *Our Lady of Guadalupe Sch. v. Morrissey-Berru,* 591 U.S. 732, 753 (2020) (rejecting that titles are "all-important" when interpreting the scope of the Ministerial Exception under the First Amendment).

Defendants' claim that the Alamo Trust has the sole right to control the daily management of the Alamo, Lt. Gov. Patrick and Commissioner Buckingham exercised intrusive and final control over nearly every detail at the Alamo, including personnel decisions and even the books that are sold in the Alamo Bookshop. (DKT. NO. 19, ¶¶ 31-42). Commissioner Buckingham is well aware of the power she possesses over the Alamo, as is evidenced by her proclamation that she—not Lt. Gov. Patrick and not the Alamo Trust—is "in charge of the Alamo." (DKT. NO. 19, ¶ 42). Commissioner Buckingham also made it clear that Alamo Trust committees serve purely in an advisory capacity, and that "decisions will be made by the Heritage Division of the GLO." *Id*. at ¶ 32.

Moreover, Texas law vests ultimate control of the Alamo with the State. Tex. Nat. Res. Code § 31.451; *cf. Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 55 (1999) (finding no state action because "nothing in Pennsylvania's constitution or statutory scheme obligates the state" to provide certain services). For all the reasons discussed herein, in Rogers's Response to the Alamo Defendants' Motion to Dismiss (which is incorporated herein), and in Rogers's Complaint, the State, Lt. Gov. Patrick, and Commissioner Buckingham have repeatedly micromanaged the Alamo Trust, including by interfering in Rogers's employment and termination. Lt. Gov. Patrick and Commissioner Buckingham cannot escape the Court's jurisdiction here by claiming that they have no authority when the allegations in Rogers's Amended Complaint show otherwise.

Critically, because Commissioner Buckingham and Lt. Gov. Patrick attack redressability only as it relates to their involvement in Rogers's future reinstatement, their redressability arguments apply only to the official capacity claims against them for the requested injunctive

relief of reinstatement, not the personal capacity claim for damages. (DKT. 21 at 5-6[3]; DKT. 22 at 12, 16[4]). Therefore, even if this Court concludes that Commissioner Buckingham and Lt. Gov. Patrick cannot be ordered to participate in Rogers's reinstatement and that the Alamo Defendants can reinstate Rogers without any action required by the state officials, Rogers would still have standing against the state officials in their personal capacities for damages.

**2.** **Commissioner Buckingham and Lt. Gov. Patrick Do Not Enjoy Sovereign Immunity and Must Face Rogers's Allegations.**

Commissioner Buckingham and Lt. Gov. Patrick's next attempt to avoid the consequences of their unconstitutional actions is equally unsuccessful. They claim that Rogers's claims are barred by sovereign immunity, but in making those arguments they misrepresent the nature of Rogers's claims.

**a.** **Sovereign Immunity Does Not Apply to Individual Capacity Claims, and Rogers Does Not Bring Claims for Damages In the Officials' Official Capacity**.

Rogers brings two types of claims against Commissioner Buckingham and Lt. Gov. Patrick: individual capacity claims and official capacity claims. Commissioner Buckingham and Lt. Gov. Patrick's motions to dismiss pursuant to sovereign immunity involve only the official capacity claims. (DKT. 21 at 6-8; DKT. 22 at 20); *Lewis v. Clarke*, 581 U.S. 155, 163 (2017) ("sovereign immunity 'does not erect a barrier against suits to impose individual and personal liability'"). In Paragraph 8 and 9 of her Complaint, Rogers makes clear that she seeks damages against Commissioner Buckingham and Lt. Gov. Patrick in their individual capacities only. (DKT. No. 19 ¶¶8-9) (stating each is sued in their individual capacities for damages and for

---

[3] Lt. Gov. Patrick writes, "any order issued by the Court against Lt. Governor Patrick would be 'utterly meaningless' as he remains unable to *reverse Plaintiff's resignation or otherwise reinstate her*." (DKT. 21 at 5-6) (emphasis added).
[4] Commissioner Buckingham writes, "As Rogers cannot establish that Commissioner Buckingham has the authority to carry out her claim for *injunctive relief*, the Court lacks jurisdiction over *that claim*." (DKT. 22 at 16) (emphasis added).

declaratory and injunctive relief in their official capacities). Therefore, the Court should deny Lt. Gov. Patrick's and Commissioner Buckingham's attempt to invoke sovereign immunity to dismiss Rogers's claims against them in their individual capacities.

> **b.** **Rogers Sufficiently Alleges that Commissioner Buckingham and Lt. Gov. Patrick Are Connected to the Alamo Defendants' Personnel Decisions to Meet *Ex Parte Young* Requirements**.

"*Ex parte Young* created a narrow doorway through the sovereign immunity defense. To turn the key on the *Ex parte Young* door, a plaintiff must sue the right defendants . . . ." *Jackson v. Wright*, 82 F.4th 362, 367 (5th Cir. 2023) (citing *Ex Parte Young*, 209 U.S. 123 (1908)). "Under *Ex parte Young*, the officers who are sued must have '**some connection** with the enforcement' of the challenged law or policy." *Id.* (emphasis in original). "[S]tate sovereign immunity is an affirmative defense, and plaintiffs are not required to anticipate or plead around affirmative defenses." *Id.* (citing *Gomez v. Toledo*, 446 U.S. 635, 640 (1980)).

When considering a lawsuit alleging First Amendment retaliation in an employment setting,[5] the Fifth Circuit has identified two relevant guideposts: "All that is required is a mere 'scintilla of "enforcement" by the relevant state official with respect to the challenged law.'" *Id.* (citing references omitted). Second, "[w]e further know that an official must have more than 'the general duty to see that the laws of the state are implemented.'" *Id.* As one federal court has recently queried, this analysis requires answering the question, "who pulled the strings behind" Rogers's termination? *Casper v. West*, 4:23-cv-42, 2025 U.S. Dist. LEXIS 27957, at *32 (E.D. Tex. 2025).

---

[5] "The cases on which Defendants rely concern the constitutionality of state statutes and state officials' connection to the enforcement of those statutes. This case does not concern enforceability of a state statute." *Stamps v. Univ. of Tex. at Austin*, No. 1:20-cv-01204-LY-SH, 2022 U.S. Dist. LEXIS 30372, at *23 n.6 (W.D. Tex. 2022). Here, too, Defendants focus on Fifth Circuit cases discussing enforcement of state statutes, not whether officials have a sufficient connection with an employment relationship to be considered jointly responsible for employment decisions.

In *Jackson v. Wright*, also a First Amendment case, the Fifth Circuit held that individual members of the public university's board of trustees were appropriate defendants. There, a dean and a provost removed a professor from his role with a scholarly journal out of concern that the journal was espousing racist ideas. *Jackson*, 82 F.4th at 365-66. Although the board members were not involved in the decision to remove the professor, they had "direct governing authority" over the administrators who made the ultimate decision to remove the plaintiff from his role. *Id.* at 368. Based on these facts, the Fifth Circuit held that the board members had far more than the necessary "scintilla of enforcement" and "general duty to see that the laws of the state" were implemented. *Id.*

The same result is necessary here. As to Commissioner Buckingham, both guideposts plainly indicate she is not entitled to sovereign immunity. The State of Texas placed the "Alamo complex under the jurisdiction of the [GLO]. The land office is responsible for the preservation, maintenance, and restoration of the Alamo complex and its contents and the protection of the historical and architectural integrity of the exterior, interior, and grounds of the Alamo complex." Tex. Nat. Res. Code § 31.451(a). "Any power or duty related to the Alamo complex formerly vested in any other state agency or entity is vested solely in the land office." Tex. Nat. Res. Code § 31.451(b). This goes far beyond a "general duty" to implement Texas law and implicates the management of the Alamo directly. Indeed, Commissioner Buckingham oversees the entirety of the Alamo, both by statute and in practice. (DKT. 19, ¶¶31-42). The GLO participated in Rogers's interview, Rogers reported originally to the Senior Deputy Director of the GLO, and Commissioner Buckingham directed Rogers in her day-to-day work. (*Id.* ¶¶31-42). Commissioner Buckingham required Rogers to meet with her weekly. (Id. at ¶34). The GLO even embedded its own employee at the Alamo Trust office to "manag[e] the Alamo Shrine." (*Id.* at ¶38). Following Buckingham's involvement in the 2025 Indigenous People's Day post,

15

she made clear that her office could and would directly interfere with the management of the Alamo: the GLO would be "holding those responsible accountable and will be implementing a new process to ensure my office has oversight." (*Id.* ¶53). If Commissioner Buckingham did not play any role in personnel matters at the Alamo as she claims, then how could she make that promise and then follow through on that promise to hold those responsible for their allegedly "woke" actions? Commissioner Buckingham even brags about being "in charge of the Alamo." (*Id.* ¶42). Buckingham's heavy-handed oversight is far more than the required "scintilla" of involvement in Rogers's employment at the Alamo.

Although Lt. Gov. Patrick's involvement at the Alamo is less formalized in statute, he has nevertheless exercised significant oversight there for many years. For example, he insisted on personally revising script language at the visitor center. (DKT. 19 ¶41). Patrick's heavy involvement led to complaints by Commissioner Buckingham about his influence. (*Id.*) Moreover, the power struggle between Commissioner Buckingham and Lt. Gov. Patrick frequently placed Rogers in the middle of the two officials. (*Id.* ¶42). At one point, Lt. Gov. Patrick told Rogers, of Commissioner Buckingham, "If she asks again tell her the [L]egislature has over 600 million invested in the Alamo and we have a right to have a say in that investment[.]" (*Id.*) Then, when Lt. Gov. Patrick decided to create an issue regarding Rogers's dissertation, he forced her termination within 24 hours. (DKT. 19 ¶¶57-61). This involvement is more than sufficient to make Lt. Gov. Patrick a proper defendant under *Ex Parte Young*.

In short, Commissioner Buckingham and Lt. Gov. Patrick want to and do control every aspect of the Alamo, including micromanaging its employees, and now should face the constitutional impact of that interference. They have spent many years "pulling the strings" and dictating personnel decisions at the Alamo, exercising compulsion and control to get what they want, ultimately culminating in their decision to force Rogers's constructive termination. *See Mi*

*Familia Vota v. Ogg*, 105 F.4th 313, 332 (5th Cir. 2024). Because Commissioner Buckingham and Lt. Gov. Patrick have much more than "some connection" to Rogers's termination and her request for reinstatement, Rogers's claims against them in their official capacities is not barred by sovereign immunity.

**B.      Rogers Sufficiently Pleaded that Commissioner Buckingham and Lt. Gov. Patrick Retaliated Against Her Because of the Speech in Her Dissertation.**

To survive the Alamo Defendants' motion to dismiss regarding her termination, Rogers must allege facts supporting four elements: "(1) the plaintiff suffered an adverse employment decision, (2) the plaintiff's speech involved a matter of public concern, (3) the plaintiff's interest in speaking outweighed the governmental defendant's interest in promoting efficiency, and (4) the protected speech motivated the defendant's conduct." *Kinney v. Weaver*, 367 F.3d 337, 356 (5th Cir. 2004) (en banc) (citation omitted); *see also Bd. of Cnty. Comm'rs v. Umbehr*, 518 U.S. 668, 684-85 (1996) ("Claims by governmental contractors that their speech caused retaliation against them by the government are analyzed using the same framework as that for claims by public employees."). Commissioner Buckingham and Lt. Gov. Patrick claim that Rogers cannot satisfy the second, third or fourth elements.

**1.      Rogers Has Sufficiently Pleaded that the Speech in her Dissertation Was Made As A Citizen, Not an Employee of the Alamo Trust.**

"Speech by citizens on matters of public concern lies at the heart of the First Amendment, which 'was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people.'" *Lane v. Franks*, 573 U.S. 228, 235-36 (2014) (quoting *Roth* v. *United States*, 354 U. S. 476, 484 (1957)).[6] The critical question asked during

---

[6] None of the Defendants allege that Rogers's speech did not involve a matter of public concern, and Lt. Gov. Patrick explicitly admits that it did. (Dkt. 21 at 12). Therefore, Rogers does not address this issue. However, it is plain that the statements in her dissertation, which addressed ongoing publicly debated issues related to state government oversight of education and the role of the Alamo, was made against a

this second element is whether Rogers was speaking as a citizen or pursuant to her official duties. *Id.*[7]

The Supreme Court has firmly rejected the notion that speech by a government employee loses First Amendment protection because it "concerns information related to or learned through public employment." *Lane*, 573 U.S. at 236; *see also Charles v. Grief*, 522 F.3d 508, 513 (5th Cir. 2008) (holding that even if the speech concerned "special knowledge" gained only though government employment, "[t]o hold that any employee's speech is not protected merely because it concerns facts that he happened to learn while at work would severely undercut First Amendment rights."). A public employee's speech loses First Amendment protection only when it is "made pursuant to [her] official duties." *Garcetti v. Ceballas*, 547 U.S. 410, 421 (2006). "When a public employee speaks pursuant to employment responsibilities, . . . there is no relevant analogue to speech by citizens who are not government employees." *Id.* at 424.

In determining whether an employee spoke pursuant to her official duties, the Supreme Court has emphasized the critical question is "whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." *Lane*, 573 U.S. at 240. This is a "practical" inquiry. *Id.* at 421, 424. When conducting this "practical" examination, Fifth Circuit courts have considered whether the employee was paid for the task,

---

"backdrop of public debate" and therefore involved a matter of public concern. *Markos v. City of Atlanta*, 364 F.3d 567, 572 (5th Cir. 2004).

[7] Lt. Governor Patrick also includes a confusing argument about whether Rogers is a public official. *See* (DKT. 21 at 10) ("Plaintiff, like Defendant, is a public figure. . . . However, whether Plaintiff is a public or private figure is ultimately irrelevant . . . ."). It appears that Lt. Gov. Patrick is mistaking the citizen/employee speech analysis with public/private figure analysis for defamation, which is irrelevant here. Rogers therefore assumes that Lt. Gov. Patrick intends to argue that Rogers was speaking as an employee, not a citizen, in her dissertation. It is also possible that he intended to argue a lack of state action, which is addressed in detail in Rogers's response to the Alamo Defendants' motion to dismiss and is fully incorporated here. To the extent Lt. Gov. Patrick meant to make a different argument, Rogers will seek permission to file a sur-reply.

both in general and in that specific instance. *Haverda v. Hays County*, 723 F.3d 586, 598 (5th Cir. 2013).

Commissioner Buckingham and Lt. Gov. Patrick claim that because Rogers identified herself as the Executive Director of the Trust and described some of her job duties and challenges in the dissertation, the dissertation was somehow converted into employee speech. Commissioner Buckingham argues that Rogers "effectively parlay[ed] her position and responsibilities to give a patina of authority to her opinions." (DKT. 23 at 23). Unsurprisingly, Defendants cite no legal precedent; indeed, Fifth Circuit caselaw forecloses this argument. *Bevill v. Fletcher*, 26 F.4th 270 (5th Cir. 2022).

In *Bevill*, a police captain filed an affidavit in support of his friend's request for a change of venue, based on his belief that the close relationship between the county sheriff, district attorney, and judge would prevent a fair trial. *Id.* at 273. In holding that the captain's affidavit was not written pursuant to his official duties, the Fifth Circuit noted, "To be sure, Defendants correctly note that Bevill 'prominently presented [his] job title in his motion to transfer affidavit directly after stating his name,' thereby giving his affidavit the imprimatur of his position. But that demonstrates Bevill's knowledge of the close personal relationships among Defendants, not that he spoke according to an official duty.'" *Id.* at 276-77. The Court concluded, "for speech to be subject to the employer's 'control,' it must 'owe[] its existence to' the 'public employee's professional responsibilities,' *id.*, or otherwise be 'for the benefit of the employer.'" *Id.* at 278 (quoting *Anderson v. Valdez*, 845 F.3d 580, 597 (5th Cir. 2016)). In his affidavit, the police captain did not speak for his department's benefit and his speech did not owe its existence to the department; indeed, any citizen off the street could submit a similar affidavit. Therefore, the captain spoke as a citizen and not an employee. *Id.*

The same result is clearly established here. The most the Alamo Defendants can say is that Rogers mentioned her position at the Alamo a handful of times in her dissertation and described her role.[8] But, just as for the police captain in *Bevill*, Rogers's familiarity with the topic simply demonstrates the source of her knowledge and experience. Citizens write dissertations in support of a personal academic degree every day. Rogers's dissertation does not owe its existence to her former position at the Alamo Trust. Moreover, the Alamo Trust did not fund or sponsor her education in any way. (DKT. 19 ¶46); *Haverda*, 723 F.3d at 598. Indeed, Rogers began her doctoral program before she began working for the Alamo Trust. (*Id.*). The dissertation focused on four museums and historic sites, none of which was The Alamo or even located in Texas. (*Id.* at ¶47).

Lt. Gov. Patrick cites no legal authority to support his position—and, in fact, he has already publicly conceded that Rogers's dissertation expresses only "her personal view." (DKT. 19 ¶ 58) (quoting his October 28, 2025 opinion piece). Commissioner Buckingham cites more, claiming that *Gibson v. Kilpatrick* supports her argument that Rogers was speaking as an employee. (DKT. 22 at 23) (quoting dicta from 773 F.3d 661, 670 (5th Cir. 2014) ("For when an employee's official duties include communicating with outside agencies or the press, it would be in dissonance with *Garcetti* to conclude that, when he does so, he enjoys First Amendment

---

[8] It is not appropriate for the Court to consider the entirety of Rogers's dissertation at this stage of proceedings, unless the Court converts Defendants' motions to dismiss into summary judgment motions. If the Court does review the dissertation in full, however, Rogers notes that her personal dissertation describes its purpose as follows: "This study examined how history and social studies teachers on the frontlines in the classroom can engage in ongoing and high-quality professional development opportunities that build confidence in addition to helping them hone their instructional practices beyond content knowledge. Specifically, the study addressed the role that historical sites in the United States can play in fostering this engagement." (DKT. 16-1 at 10). The dissertation analyzed four historical sites— none of which is the Alamo. (*Id.* at 2).

protection."). But *Gibson*, which did not involve an employee speaking to the media at all,[9] does nothing to alter, and indeed it confirms, that "the proper inquiry is a practical one." *Id.* at 667. When conducting this practical inquiry, two facts demonstrate that Commissioner Buckingham's argument fails: first, Rogers's dissertation was a private endeavor that was not publicized and was not, as Buckingham claims, "targeted toward the media." (DKT. 22 at 23). Indeed, no media outlet, politician, or community member cared about Rogers's personal dissertation for two years, until Lt. Gov. Patrick posted excerpts to X.com. Second, when Rogers did speak to the media after her employment ended, she was no longer an employee and could not be engaging in employee speech.

Defendants present no valid legal or factual argument that Rogers was speaking as an employee. Rogers easily establishes that she was speaking as a citizen and not as an employee, and the motion to dismiss must be denied.

> 2.     **Rogers's First Amendment Interest Supersedes the Alamo Defendants' Right to Efficiently Provide Public Services.**

Under *Pickering*, the third prong of a First Amendment retaliation claim involves a balancing test as "to whether the interest of the government employer in promoting the efficiency of the public services it performs through its employees outweighs the employee's interests, as a citizen, in commenting upon matters of public concern." *Pickering v. Bd. of Educ. of Tp. High Sch. Dist. 205, Will Cnty., Ill.*, 391 U.S. 563, 568 (1968); *Hurst v. Lee County*, 764 F.3d 480, 485 (5th Cir. 2014). When performing this balancing test, courts look at "whether the statement

---

[9] Defendants would do better to cite *Nixon v. City of Hous.*, 511 F.3d 494, 498 (5th Cir. 2007), which does conclude that a police officer's statement to the media "while on duty, in uniform, and while working at the scene of the accident" was employee speech. However, even *Nixon* does not aid Defendants, because the Court concluded his speech was "intended to inform the public of the circumstances of the high-speed chase, the subsequent accident, and HPD's high-speed chase policy," such that there was "no relevant analogue to speech by citizens." *Id.* Here, however, Rogers completed a dissertation no different from hundreds of others completed each year by students seeking their doctorates, demonstrating the obvious citizen analogue and establishing that Rogers was clearly speaking as a citizen and not an employee.

impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Rankin v. McPherson*, 483 U.S. 378, 388 (1987). Crucially, however, "concerns about maintaining harmony and eliminating disruption cannot be the sole measure of government interest when the employee's speech furthers other important state interests." *Branton*, 272 F.3d at 743.

### a. The Court Should Not Conduct a Fact-Intensive *Pickering* Analysis During This Pre-Discovery Stage of the Proceedings.

Courts in the Fifth Circuit do not conduct a *Pickering* balancing analysis at the motion to dismiss stage. The law is clear in the Fifth Circuit that *Pickering* balancing, "being the factually-sensitive balancing test that it is, implicates only the summary judgment, not failure to state a claim, analysis." *Kennedy v. Tangipahoa Parish Library*, 224 F.3d 359, 366 n.9 (5th Cir. 2000); *see also Cox v. Kaelin*, 577 F. App'x 306, 312 (5th Cir. 2014) ("such a balancing inquiry is not warranted at this stage of the proceedings, and it suffices that [the] pleadings . . . render it plausible that his interest in commenting on matters of public concern outweighed [the employer's] interest in promoting efficiency in the workplace."). If the Court is inclined to consider *Pickering* balancing at this early stage of the proceedings, Rogers requests discovery from Defendants on all issues implicated in the balancing analysis.

### b. If the Court Does Consider *Pickering* Balancing, Rogers Has Plausibly Alleged that Her Interests Outweigh Defendants'.

Commissioner Buckingham and Lt. Gov. Patrick claim that the Alamo Defendants' interest in the efficient provision of services and their own free speech rights outweigh Rogers's interest in speech submitted to obtain her doctorate. If the Court does apply *Pickering* balancing at this early stage, there are no facts supporting Defendants' claims.

The balancing test asks whether the plaintiff's speech: "(1) was likely to generate controversy and disruption, (2) impeded the department's general performance and operation, and (3) affected working relationships necessary to the department's proper functioning." *Kennedy v. Tangipahoa Par. Library Bd. of Control*, 224 F.3d 359, 378 (5th Cir. 2000). None of these facts are present in Rogers's Complaint and, in fact, Rogers's well-pleaded allegations establish that none are relevant. Indeed, Rogers's dissertation was completed over two years before Lt. Gov. Patrick tweeted about it, demonstrating that Rogers's speech did not cause any disruptions at work or even in public. (Dkt. 19 ¶47). Rogers had made similar statements that were publicly posted online in 2022 and 2023, and no public official or community member had ever expressed any concerns about them. (Dkt. 19 ¶76). "The indispensable predicate to balancing, however, is evidence from the public employer of actual or incipient disruption to the provision of public services." *Grogan v. Lange*, 617 F. App'x 288, 292 (5th Cir. 2015). Defendants cannot point to a single fact in Rogers' Complaint that her speech had any impact on the Alamo Defendants' efficient provision of public services, which is fatal to their argument.

Lt. Gov. Patrick and Commissioner Buckingham's own free speech rights also cannot outweigh Rogers's own. Both state officials cite *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 687 (4th Cir. 2000), which addressed the appropriate balancing between a company's free speech rights and those of state officials. There, a company ran an advertising campaign criticizing state officials. In turn, the state officials accused the company of preying on the elderly, infirmed and incapacitated. *Id.* at 683. The Fourth Circuit concluded that "in the absence of a threat, coercion, or intimidation intimating that punishment, sanction, or adverse regulatory action will imminently follow, such speech does not adversely affect a citizen's First Amendment rights, even if defamatory." *Id.* at 687. There are two outcome-determinative differences between Rogers's claims and *Suarez*.

First, the *Suarez* court itself distinguished its factual background from the "public employment context" where the employee is either denied reemployment or is terminated and the adverse action was therefore obvious, as opposed to employment cases where the plaintiff was merely criticized. *Id.* In other words, *Suarez* analogized state officials' right to criticize, reprimand, or falsely accuse their employees to the state defendants' right to accuse the plaintiff of preying on the vulnerable. *Suarez* recognized that when a plaintiff, like Rogers, is terminated and not merely subjected to criticism, the outcome is different. The Fifth Circuit has made this distinction plain: "retaliatory criticisms, investigations, and false accusations *that do not lead to some more tangible adverse action* are not actionable under § 1983." *Colson v. Grohman*, 174 F.3d 498, 513 (5th Cir. 1999) (emphasis added). Rogers is not complaining that Commissioner Buckingham and Lt. Gov. Patrick criticized her or chilled her speech. Rogers is suing because their actions caused her termination—the precise "tangible adverse action" that *Colson* recognized as actionable under § 1983.

Second, even if the Court is inclined to weigh Defendants' free speech rights with Rogers's own rights, every circuit court to consider the issue has held that threats, coercion, or intimidation from public officials, even in the absence of a tangible adverse employment action, supports a First Amendment retaliation claim. *See, e.g.*, *Mirabella v. Villard*, 853 F.3d 641, 651 (3d Cir. 2017) (official's speech is retaliatory if it contains "a threat, coercion, or intimidation, intimating that punishment, sanction, or adverse regulatory action will follow."); *Novoselsky v. Brown*, 822 F.3d 342, 356 (7th Cir. 2016); *McLaughlin v. Watson*, 271 F.3d 566, 573 (3d Cir. 2001); *X-Men Sec., Inc. v. Pataki*, 196 F.3d 56, 70 (2d Cir. 1999). Here, Rogers has alleged facts demonstrating that Lt. Gov. Patrick and Commissioner Buckingham threatened the Alamo Defendants and coerced them to terminate Rogers. (DKT. 19 ¶¶52-64). Defendants also ignore their long history of interfering with the Alamo to make sure the Alamo Defendants comply with

24

their desires. (DKT. 19 ¶¶31-42). On this record, the Court cannot find that Lt. Gov. Patrick and Commissioner Buckingham's free speech rights trump Rogers's own as a matter of law.

Moreover, although Lt. Gov. Patrick and Commissioner Buckingham would have the Court conclude that their valid interests run only one way (that is, toward suppressing any speech that does not fit their preferred narrative of the Alamo), Defendants cannot ignore their own interest in complying with State law and contractual obligations. Specifically, state law requires that "the entire history of the Alamo, from the time the Alamo was established as a mission until the present, should be recognized." Tex. Nat. Res. Code § 31.450(a)(3). Defendants cannot ignore this statute simply because they want to focus only on the battle. Even more significantly, the GLO's land use lease with the City of San Antonio requires the GLO to use "best efforts to tell . . . the whole history of the Alamo and work with all traditional groups that have historical or cultural ties to the Premises, for example but not limited to Tejano, Indigenous, and Texian groups . . . ." (DKT. 19, ¶20). When conducting *Pickering* balancing, Defendants cannot ignore that state law and binding contracts require them to engage in precisely the same acknowledgment of competing interests that Rogers recognized in her dissertation.

Whether the Court considers the merits of *Pickering* balancing or not, Rogers's Complaint cannot be dismissed on this basis.

### 3. Rogers's Citizen Speech Motivated Defendants' Decision to Terminate Her.

Defendants' final attempt to avoid Rogers's First Amendment retaliation claim also fails. They claim they were not sufficiently involved in Rogers's termination to be proper Defendants. These arguments track their standing and sovereign immunity arguments, addressed above, and fail for all the same reasons.

In addition to Rogers's discussion of standing and sovereign immunity, First Amendment retaliation caselaw is clearly established that Lt. Gov. Patrick's and Commissioner

Buckingham's personal animus toward Rogers is sufficient to hold them causally responsible for her termination. In *Kinney v. Weaver*, 367 F.3d 337 (5th Cir. 2004), a pair of instructors at the East Texas Police Academy, a division of Kilgore College, testified against an officer who fatally shot a teenager. *Id.* at 341-42. Heads of police departments in East Texas, who provided most of the officers to the academy for training, then refused to send their officers to the academy as long as the instructors continued teaching there. *Id.* at 342-43. In response, one of the instructors resigned, while the other instructor was let go. *Id.* at 345. Both instructors sued the department heads for First Amendment retaliation. *Id.* at 345-46. The police chiefs argued that they could not be held responsible for the instructors' employment outcomes because only the college organizing the academy could terminate its employees. *Id.* at 357.

The Fifth Circuit rejected that argument, holding "that it would [not] have been reasonable for officers in [the defendants'] positions to believe that they were unfettered by the First Amendment merely because their economic relationship with [the plaintiffs] was non-employment and non-contractual." *Id.* at 368. *Kinney* therefore "clearly establishes the right of a plaintiff to be free from governmental officials' exerting their power or influence over a third-party employer to cause the plaintiff to be terminated for exercising his First Amendment rights." *Bevill I*, 26 F.4th at 282-83. For over twenty years, then, state officials have been on notice that they may not interfere with the Alamo Defendants' employment of Rogers in retaliation for her exercise of free speech.

Commissioner Buckingham and Lt. Gov. Patrick have spent many years "pulling the strings" and dictating personnel decisions at the Alamo, exercising compulsion and control to get what they want, ultimately culminating in their decision to force Rogers's termination. Rogers's allegations, which must be accepted as true, leave no doubt that Rogers has adequately pled that

her citizen-speech in her dissertation caused her termination and that Commissioner Buckingham and Lt. Gov. Patrick were directly involved.

**4.      Rogers's Complaint States a Conspiracy Claim Against the State Defendants.**

Conspiracy claims asserted under § 1983 require plaintiffs to prove "(1) the existence of a conspiracy involving state action and (2) a deprivation of civil rights in furtherance of the conspiracy by a party to the conspiracy." *Armstrong v. Ashley*, 60 F.4th 262, 280 (5th Cir. 2023). Because Rogers's complaint establishes a deprivation of her civil rights as argued above, the only question is whether Rogers adequately alleged that the Alamo Defendants with either or both of Commissioner Buckingham and Lt. Gov. Patrick had an agreement to violate Rogers's constitutional rights. Rogers alleges precisely these facts.

In *Bevill I*, the Fifth Circuit concluded that the police captain had alleged facts supporting the close relationship between the defendants and the defendants' joint request to the mayor that the captain be terminated, and that these facts were sufficient to demonstrate a conspiracy. *Id.* at 26 F.4th at 284. In particular, the police captain described a "common motive" among the defendants to protect their reputations. *Id.*

Here, too, Rogers plainly alleges concerted action. First, the Alamo Defendants complied with Commissioner Buckingham's coercive warning to remove "woke" from the Alamo and ensure that the Alamo placed her preferred emphasis on the battle. (DKT. 19 ¶¶53-56, 61). Next, the Alamo Defendants complied with Lt. Gov. Patrick's directive to terminate Rogers for the statements made in her dissertation. (*Id.* ¶¶57-60). These actions were all done in support of Defendants' preferred version of "how the history of the Alamo should be told." (*Id.* ¶60).

Critically, a conspiracy claim is appropriate here especially because Rogers does not know, at this early stage of the proceedings, exactly what happened behind the scenes. "[C]onspiracy may be charged under section 1983 as the legal mechanism through which to

impose liability on all of the defendants without regard to who committed the particular act." *Hill v. Gressert*, 705 F. App'x 219, 221 (5th Cir. 2017) (citing *Hale v. Townley*, 45 F.3d 914, 920 (5th Cir. 1995). Because these allegations allege facts demonstrating an agreement between the Alamo Defendants and state officials to violate Rogers's First Amendment rights, the motion to dismiss the conspiracy claim must be denied.

**5.      Commissioner Buckingham and Lt. Gov. Patrick Are Not Entitled to Qualified Immunity in Their Personal Capacities.**

Finally, Defendants attempt to escape liability by seeking qualified immunity. Qualified immunity only "protects government officials from civil damages liability when their actions could reasonably have been believed to be legal." *Morgan v. Swanson*, 659 F.3d 359, 370 (5th Cir. 2011). Therefore, Rogers will prevail if she can show that her First Amendment right to free speech was "clearly established" as of her termination in October 2025. *See id.*

To overcome qualified immunity, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987) (citations omitted). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Id.* "The central concept is that of 'fair warning': The law can be clearly established 'despite notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights.'" *Kinney*, 367 F.3d at 350 (quoting *Hope v. Pelzer*, 536 U.S. 730, 740 (2002)). "That this court has not previously considered an identical fact pattern does not mean that a litigant's rights were not clearly established." *Juarez v. Aguilar*, 666 F.3d 325, 336 (5th Cir. 2011).

Commissioner Buckingham and Lt. Gov. Patrick do not make any specific arguments in favor of qualified immunity, instead claiming broadly that Rogers cannot show a violation of her constitutional rights at all, let alone a clearly established one.[10] But they are incorrect. Defendants have long had "clear warning that when a public employee engages in speech outside of his employment duties, and the employee directs his speech externally rather than within the chain of command, the employer may not discipline the employee for engaging in the speech in question. *See Lane*, 573 U.S. at 240 ("[T]he mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into employee—rather than citizen—speech."); *Bevill*, 26 F.4th at 278-279; *Hardesty v. Cochran*, 621 F. App'x 771, 780 (5th Cir. 2015) (citing *Cutler v. Stephen F. Austin State Univ.*, 767 F.3d 462, 473 (5th Cir. 2014) "More specific to the conduct at issue in this case, the law was clearly established [in 2009] that speech directed to a person outside of the workplace on a matter of public concern only tangentially related to official duties is speech protected by the First Amendment." *Petrie v. Salame*, 546 Fed. App'x. 466, 470 (5th Cir. 2013). This is precisely the situation here.

Defendants also cannot escape this result merely because they did not employ Rogers directly. Since at least 2004, it has been clearly established that a plaintiff must be "free from governmental officials' exerting their power or influence over a third-party employer to cause the plaintiff to be terminated for exercising his First Amendment rights." *Bevill I*, 26 F.4th at 282-83.

---

[10] Lt. Gov. Patrick also suggests that Rogers must meet a heightened pleading standard (Dkt. 21 at 13), which is not true. "We therefore apply the general pleading standard derived from Rule 8(a)(2) in considering whether a plaintiff has stated a retaliation claim." *Anderson v. Valdez*, 845 F.3d 580, 590 (5th Cir. 2016) (rejecting a heightened pleading standard). If the Court determines that it could benefit from additional factual allegations, "the court *may [then], in its discretion*, insist that a plaintiff file a reply tailored to [the defendant's] answer [or motion to dismiss] pleading the defense of qualified immunity." *Id.* (citing references omitted) (emphasis in original).

Commissioner Buckingham focuses on the causal connection element, arguing that "Rogers would have the Court conclude that the alleged causal connection between Commissioner Buckingham's statements and Rogers's resignation was so iron-clad that Commissioner Buckingham was on constructive notice that such statements would violate the law." (DKT. 22 at 28). But the Court need undertake no such analysis, because the causation and retaliatory animus element does not have to be clearly established. *Wetherbe v. Tex. Tech. Univ. Sys.*, 138 F.4th 296, 303 (5th Cir. 2025); *Johnson v. Halstead*, 916 F.3d 410, 421 n.4 (5th Cir. 2019) (noting that qualified immunity "asks whether a '*right* was "clearly established" at the time of the challenged conduct,'" not whether causation were clearly established) (emphasis in original) (*Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (emphasis added)). Therefore, it is enough that Rogers has shown (1) it is clearly established that speech directed to a person outside of the workplace on a matter of public concern only tangentially related to official duties is speech protected by the First Amendment; and (2) it is clearly established that a plaintiff must be free from governmental officials exerting their power or influence over a third-party employer to cause the plaintiff to be terminated for exercising her First Amendment rights.

Lt. Gov. Patrick ends by implying that he is the state, and therefore he has the right to say and do whatever he wants because he funds the Alamo. *See* (DKT. 21 at 17) (citing *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 833 (1995) ("[W]hen the government appropriates public funds to promote a particular policy of its own it is entitled to say what it wishes."). *Rosenberger* says nothing more than the obvious: "Restricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen." *Garcetti*, 547 U.S. at 421-22 (citing *Rosenberger*, 515 U.S. at 833). It is just this attitude, demonstrating that Lt. Gov. Patrick thinks he is above the constitution, that led him to violate the First Amendment. Because the law is

clearly established that speech directed to a person outside of the workplace on a matter of public concern only tangentially related to official duties is speech protected by the First Amendment, Defendants' motion to dismiss on qualified immunity grounds must be denied.

## IV.   CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that this Court deny Defendants' Motions to Dismiss and order any and all relief, in law or in equity, to which Plaintiff is justly entitled. Alternatively, if the Court is inclined to grant Defendants' jurisdictional arguments, Plaintiff requests the opportunity to conduct discovery. Alternately, if the Court grants Defendants' Motion, Plaintiff respectfully requests an opportunity to replead.

/s/ Lawrence Morales II
Lawrence Morales II
State Bar No. 24051077
lawrence@themoralesfirm.com
Allison S. Hartry
State Bar. No. 24083149
ahartry@themoralesfirm.com
**THE MORALES FIRM, P.C.**
6243 Interstate 10 West, Suite 132
Telephone No. (210) 225-0811
Facsimile No. (210) 225-0821

***ATTORNEYS FOR PLAINTIFF***

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was filed electronically with the Court and delivered by CM/ECF to all counsel of record on this 17th day of March, 2026.

/s/ Allison S. Hartry
Allison S. Hartry