**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| KATE ROGERS,<br>*Plaintiff* | §<br>§ | |
| | § | |
| v. | § | Case No. SA-25-CV-01500-XR |
| | § | |
| ALAMO TRUST, INC., DAN PATRICK, DAWN BUCKINGHAM, REMEMBER THE ALAMO FOUNDATION, WELCOME WILSON JR., ESPERANZA ANDRADE,<br>*Defendants* | §<br>§<br>§<br>§<br>§<br>§ | |

**ORDER ON MOTIONS TO DISMISS**

On this date, the Court considered Defendant Dan Patrick's Motion to Dismiss (ECF No. 21); Defendant Dawn Buckingham's Motion to Dismiss (ECF No. 22); Defendants Alamo Trust, Inc., Esperanza Andrade, Remember the Alamo Foundation, and Welcome Wilson, Jr.'s (the "Alamo Defendants") Motion to Dismiss (ECF No. 23), and the briefing associated with all three motions (ECF Nos. 24–28). After careful consideration, Patrick's Motion (ECF No. 21) is **GRANTED IN PART AND DENIED IN PART**; Buckingham's Motion (ECF No. 22) is **DENIED**; and the Alamo Defendants' Motion (ECF No. 23) is **GRANTED IN PART AND DENIED IN PART**.

Rogers's official-capacity claims against Patrick are **DISMISSED WITHOUT PREJUDICE** for lack of subject matter jurisdiction. Her claims against the Foundation based on her alleged constructive discharge are **DISMISSED WITHOUT PREJUDICE** for failure to state a claim. Rogers's individual-capacity claims against Patrick, her claims against the Foundation based on the alleged withdrawal of her severance offer, and all of her claims against Buckingham, Andrade, Alamo Trust, and Wilson remain pending.

## BACKGROUND[1]

This case concerns Plaintiff Kate Rogers's alleged forced resignation from her position as President and Chief Executive Officer of Alamo Trust, Inc.—a nonprofit that manages and preserves the Alamo on behalf of the Texas General Land Office. *See* ECF No. 19 ¶¶ 3, 9, 21, 95. Rogers brings conspiracy and First Amendment retaliation claims under 42 U.S.C. Section 1983 against Alamo Trust, two of its board members, its supporting organization, Texas Lieutenant Governor Dan Patrick, and Texas General Land Office ("GLO") Commissioner Dawn Buckingham.

### I. The Alamo Generally

The Alamo is a historical site in San Antonio, Texas. The Texas Legislature has described it as "a symbol of liberty and freedom for this state" and as "a world-class destination that provides a place of remembrance and education." TEX. NAT. RES. CODE § 31.450; ECF No. 19 ¶ 17. By statute, "the Alamo complex is under the jurisdiction of the [GLO]," which is "responsible for" its preservation and maintenance, among other things. TEX. NAT. RES. CODE § 31.451(a). The City of San Antonio has leased the Alamo Plaza and associated streets to the GLO for the purpose of "carrying out the Alamo Plan."[2] ECF No. 19 ¶ 20.

The GLO "may participate in the establishment of and partner with a qualifying nonprofit organization the purposes of which include raising funds for or providing services or other benefits for the preservation of the Alamo complex. The land office may contract with the organization for the performance of any activity." TEX. NAT. RES. CODE § 31.451(d). Under this authority, the

[1] Except where otherwise noted, these facts are derived from the Amended Complaint (ECF No. 19) and materials incorporated therein, taking "all well-pleaded facts as true and view[ing] those facts in the light most favorable to the plaintiff[]." *See Gomez v. Galman*, 18 F.4th 769, 775 (5th Cir. 2021).

[2] The "Alamo Plan" is an "effort to restore dignity and reverence to" the Alamo by preserving buildings, recapturing land, and creating a "world-class Visitor Center and Museum to tell the full history of the site." ECF No. 19 ¶ 21.

GLO entered into a management contract with Alamo Trust, Inc., a 501(c)(3) nonprofit charitable organization, under which the Alamo Trust has the "sole right and obligation to conduct and control all aspects of the daily management, operations, communications, and marketing of the Alamo." *See* ECF No. 19 ¶ 31.

### II. The Other Alamo Defendants

Defendant Remember the Alamo Foundation (the "Foundation") is a nonprofit entity under 26 U.S.C. Section 509(a)(3). ECF No. 19 ¶ 10. That means that the Foundation is (A) organized and operated "exclusively for the benefit of, to perform the functions of, or to carry out the purposes of" Alamo Trust and (B) "operated, supervised, or controlled" by Alamo Trust. *See* 26 U.S.C. § 509(a)(3); Marilyn E. Phelan, NONPROFIT ORGANIZATIONS: LAW AND TAXATION § 9:21 (2d ed. 2025). While Rogers worked at the Alamo, she alleges the Foundation paid 40% of her salary, Alamo Trust paid 60% of her salary, and they were jointly responsible for setting the terms and conditions of her employment. ECF No. 19 ¶¶ 9–10.[3]

Defendant Welcome Wilson, Jr. is Chair of the Alamo Trust Board of Directors. ECF No. 19 ¶ 11. Defendant Esperanza "Hope" Andrade was Treasurer of the Alamo Trust Board of Directors until Rogers's departure, when Andrade was appointed President and CEO of Alamo Trust. ECF No. 19 ¶ 12.

### III. State Involvement at the Alamo

The GLO, Commissioner Buckingham, and Lieutenant Governor Patrick play large roles in the Alamo's operations, including employment decisions.

[3] The Alamo Defendants claim that the Foundation did not pay any of Rogers's salary and did not jointly set her terms and conditions of employment. ECF No. 23 at 19–20. They also try to refute several other allegations in the Amended Complaint. *See, e.g.*, ECF No. 23 at 10. Resolution of these factual disputes would be improper in considering the Alamo Defendants' Rule 12(b)(6) motion. *See Gomez*, 18 F.4th at 775.

a. Buckingham and the GLO

Rogers adequately alleges that Buckingham and the GLO exercise control at the Alamo. ECF No. 19 ¶ 31. For one thing, Buckingham and her office have allegedly made comments that reflect her control. At one point, Buckingham's general counsel warned Rogers to "straighten up and make [Buckingham] happy." ECF No. 19 ¶ 33. At another, Buckingham said that the Alamo Trust's Preservation Committee "is advisory in capacity and the decisions will be made by the Heritage Division of the GLO." ECF No. 19 ¶ 32 (emphasis omitted).

Rogers also alleges numerous examples of Buckingham actually exercising control. For example, to join Alamo Trust, Rogers had to interview with Alamo Trust Board members *and* a senior deputy director of the GLO. ECF No. 19 ¶ 32. Buckingham ordered Rogers to give tours to certain people, including family members and federal-government officials. ECF No. 19 ¶ 33. Buckingham's staff was "in continual contact with Rogers to direct her work at the Alamo." ECF No. 19 ¶ 39. Buckingham and her staff directed design choices, ECF No. 19 ¶ 40, and had Rogers cancel an event. ECF No. 19 ¶ 39. Buckingham's staff even reviewed the books available for purchase at the Alamo gift shop. *Id.*

High-level GLO officials, including Buckingham, had weekly meetings with Alamo Trust officials. ECF No. 19 ¶¶ 34–35. The Alamo's project management contractor produced monthly reports for both Alamo Trust *and* the GLO. ECF No. 19 ¶ 36. The GLO's Chief of Staff and General Counsel attended every board meeting for Alamo Trust and the Foundation. ECF No. 19 ¶ 37. And Buckingham ensured that a particular full-time GLO employee was "included in all meetings related to the Alamo Plan"—Buckingham even dictated the location of that employee's office at Alamo Trust. ECF No. 19 ¶ 38.

One incident provides particularly strong support for the allegation that Buckingham exercises control at the Alamo. On October 13, 2025, the Alamo's X account issued a statement that read, "Today, we honor Indigenous Peoples and their communities, recognizing their history at the Alamo. Opening in 2027, the Alamo Visitor Center and Museum will feature an Indigenous Peoples Gallery, celebrating the bands, clans and tribes that shaped the region #IndigenousPeoplesDay." ECF No. 19 ¶ 52. The next day, Buckingham posted on X, "I did NOT authorize th[e Alamo's Indigenous Peoples' Day] post. This is frankly unacceptable and it has been deleted. Woke has no place at the Alamo." ECF No. 19 ¶ 53. The post also stated that the GLO would "hold[] those responsible accountable and . . . implement[] a new process to ensure [Buckingham's] office has oversight." *Id.* Buckingham also sent a publicly posted letter to the Alamo Trust Board complaining about the Indigenous Peoples' Day post. *Id.*

In an October 15, 2025, meeting, the Alamo Trust Board told Rogers that "the state is too upset about [the post]. Someone is going to have to pay." ECF No. 19 ¶ 55. Rogers offered to resign, but the Board refused to "even consider it." *Id.* Instead, the Board voted to terminate Alamo Trust's communications director and replace a writer. *Id.* Wilson informed Buckingham that Alamo Trust and the Foundation were "taking strong corrective action," including "implementing stricter oversight measures" and "[p]roviding the [GLO] with direct involvement in the content review process moving forward." ECF No. 19 ¶ 56 (alteration in original). In this correspondence, Wilson stated that "[t]he Board . . . fully understands that the Alamo Plan would not have come to fruition but for the aid of our great State of Texas." *Id.* (ellipsis in original). According to Wilson, the Alamo Trust Board was committed to "ensuring that future actions fully reflect [Buckingham's] vision for" the Alamo. *Id.* (emphasis omitted).

b. Patrick

Patrick also plays a role at the Alamo. In fact, Buckingham has objected to his "heavy involvement with the operations of the Alamo Trust." ECF No. 19 ¶ 41. After finding out that Rogers shared "drafts of the scripts for the visitor center and museum's interpretive plan" with Buckingham, Patrick demanded that his office see the scripts too. ECF No. 19 ¶ 41. On one occasion, Patrick directed Rogers to cancel a meeting over Buckingham's objection. ECF No. 19 ¶ 42. He told Rogers to tell Buckingham that "the [L]egislature has over 600 million invested in the Alamo and [has] a right to have a say in that investment[.]" *Id.* (alterations in original).

Taken together, these allegations support a reasonable inference that Buckingham, the GLO, and Patrick have significant roles in Alamo Trust's operations. Because the Foundation is under Alamo Trust's control, Rogers has also plausibly alleged that they have significant roles at the Foundation. Buckingham and Patrick's alleged role in Rogers's forced resignation and severance negotiations—described below—further support these inferences.

## IV. Rogers's Employment at Alamo Trust

Rogers began working at Alamo Trust in 2021, as its Executive Director. ECF No. 19 ¶ 23. At some point—the Amended Complaint does not say when—she became President and CEO. *See* ECF No. 19 ¶ 3. Rogers performed well in these roles; she secured a large amount of funding and received praise from diverse stakeholders. *See* ECF No. 19 ¶ 26. Buckingham and her staff commended Rogers for her performance, ECF No. 19 ¶ 27, and Patrick spoke positively about the "puzzle of people" working on the Alamo plan, ECF No. 19 ¶ 28. The Alamo Trust Board gave Rogers a positive evaluation as recently as June 2025. ECF No. 19 ¶ 29.

## V. Rogers's Dissertation

In 2020—before joining Alamo Trust—Rogers began pursuing a doctoral degree in education at the University of Southern California ("USC"). ECF No. 19 ¶¶ 45–46. As part of the doctoral program, she wrote a dissertation, which was published in 2023. ECF No. 19 ¶ 47. Her dissertation concerned "best practices for experiential learning offered for educators at museums and historical sites." *Id.* It focused on four museums and historical sites, none of which was the Alamo. *Id.* Alamo Trust did not fund or sponsor Rogers's degree in any way. ECF No. 19 ¶ 46.

The dissertation was based on a qualitative study conducted by Rogers, ECF No. 19 ¶ 48, and it stated that "one of the main purposes" of the study was "to help inform future programming at the Alamo," ECF No. 21-1 at 21.[4] Elsewhere in the document, Rogers stated a broader goal: "to help the staff at the Alamo *as well as other museums and historic sites across the country* . . . ." ECF No. 21-1 at 81 (emphasis added).

A two-page section of the dissertation[5] titled "Role of the Researcher" briefly discussed Rogers's job at Alamo Trust. ECF No. 21-1 at 79–81. It noted that the GLO and Patrick played large roles at the Alamo and that their views were often at odds with San Antonio City officials' views. *Id.* The section added that Rogers "had to be very careful" with the study underlying her dissertation, "as it could have negative consequences for the $300 million Alamo Plan as well as [Rogers's] job." ECF No. 21-1 at 80. As a result, she said, she was "constantly . . . vigilant about the political ramifications" of the study. ECF No. 21-1 at 80–81.

---

[4] The Court may consider Rogers's dissertation at the Rule 12(b)(6) stage, because it is "attached to . . . a motion to dismiss," "referred to in the pleadings," and "central to [Rogers's] claims." *Brand Coupon Network, L.L.C. v. Catalina Mktg. Corp.*, 748 F.3d 631, 635 (5th Cir. 2014).

[5] The dissertation is over 150 pages. *See* ECF No. 21-1.

The "Role of the Researcher" section also briefly discussed the 2023 Texas legislative session. *See* ECF No. 21-1 at 79. Rogers said, "Perhaps the biggest dilemma for me as a researcher and the actual 'instrument' in this qualitative study had to do with my own political views and my current environment." *Id.* She then identified several issues that came up in the 2023 legislative session, including voter suppression, concealed carry laws, and reproductive rights. *Id.* She said that "[t]he conservative agenda also included two bills that ban educators from teaching Critical Race Theory in their classrooms and prohibited the discussion of slavery." *Id.* She noted that "Texas is one of only 10 states where members of the State Board or [sic] Education, which establishes the curriculum standards . . . , are elected in a partisan election," *id.,* and stated that she "do[es] not believe it is the role of politicians to determine what professional educators can or should teach in the classroom." ECF No. 21-1 at 80.

Shortly thereafter, the dissertation stated, "Personally, I would love to see the Alamo become a beacon for historical reconciliation and be a place that brings people together versus tearing them apart." ECF No. 19 ¶ 50. But, in light of political disagreement about what the Alamo's museum and visitor center should focus on, the dissertation said "that may not be possible at this time." *Id.*; ECF No. 21-1 at 80.

In 2022 and 2023, before publishing her dissertation, Rogers had made similar statements that were posted online, including in an article published by USC's School of Education. ECF No. 19 ¶ 58.

## VI. Rogers's Resignation

On October 22, 2025, Patrick and his chief of staff called Rogers. ECF No. 19 ¶ 57. Patrick said that he had "found" Rogers's dissertation and that it was "not acceptable." *Id.* He said, "I need you to resign. You need to resign." *Id.* He told Rogers to make a public statement that her

dissertation had "become a distraction." *Id.* After Rogers refused to commit to resigning, Patrick asked, "Are you going to say I called you?" ECF No. 19 ¶ 58. Rogers made clear that she was not going to keep the call a secret, to which Patrick responded, "Then I need to end the call." *Id.*

After the call with Patrick, Rogers spoke with two Alamo Trust senior staffers, as well as Andrade, who was treasurer of the Alamo Trust Board at the time. ECF No. 19 ¶ 59. Andrade pledged her support to Rogers and promised that the Board would stand behind her. *Id.*

The next day, Patrick called Andrade "to pressure her to force Rogers to resign." *Id.* Patrick read Andrade portions of Rogers's dissertation and insisted that Rogers be terminated. *Id.* Andrade called Rogers and relayed the message, saying, "There's nothing I can do. You need to resign." *Id.* Rogers asked, "What if I don't resign?" *Id.* Andrade responded, "Then we will fire you." *Id.* She said that she had talked with the Chair of Alamo Trust's Board—Wilson—who agreed with the ultimatum. *Id.* According to Andrade, the state demanded Rogers's termination and there was nothing the Board could do to prevent it. *Id.* Andrade asked Rogers to issue a resignation letter immediately, because "the State" wanted to make a statement that day. *Id.*

Shortly thereafter, Patrick posted two pages of Rogers's dissertation, as well as a copy of a letter he had sent to Alamo Trust and Buckingham, on X. ECF No. 19 ¶ 60. He wrote that Rogers's "newly discovered written words were shocking to [him]," that he believed Rogers's judgment was "placed in serious question," and that the dissertation "ma[de] clear she has a totally different view of how the history of the Alamo should be told." *Id.*

The next day, Buckingham posted on X: "I commend Lt. Governor Dan Patrick for his swift action at The Alamo. I appreciate the Alamo Trust Board and our continued work together bettering The Alamo." ECF No. 19 ¶ 61.

Rogers resigned from Alamo Trust, *see* ECF No. 19 ¶ 65, though the Amended Complaint does not say exactly when.

## VII. Rogers's Severance Negotiations

After Rogers resigned, Alamo Trust and the Foundation negotiated with her over severance. They insisted that, to receive severance, she had to agree to two conditions. ECF No. 19 ¶ 65. First, she could not "participate in public discussion or other publicity concerning or relating to" her employment with or resignation from Alamo Trust and the Foundation. *Id.* Second, she could not "'make any derogatory or negative comments about' the Alamo Trust," the Foundation, "and 'their parents, affiliates (including any elected officials or state and local governmental bodies affiliated with the Alamo), subsidiaries, directors, officers, employees, trustees, agents, stockholders, representatives, insurance carriers and/or attorneys.'" *Id.*

While the severance negotiations were ongoing, Rogers sat for an interview with *Texas Monthly*. ECF No. 19 ¶ 66. *Texas Monthly* published an article about Rogers's forced resignation based on the interview. ECF No. 19 ¶¶ 66, 69. When Alamo Trust and the Foundation learned of the interview, they withdrew their severance offer and ceased severance negotiations. ECF No. 19 ¶ 66. An unspecified member of the Alamo Trust Board met with Patrick and Buckingham to try to restart the negotiations. ECF No. 19 ¶ 67. But Patrick "directed the Alamo Defendants to cease severance discussions with Rogers following the" *Texas Monthly* "article because he believed it made him and the Alamo Defendants look 'weak.'" *Id.*

## VIII. Procedural History

On November 17, 2025, Rogers filed this suit against Patrick, Buckingham, and the Alamo Defendants. *See* ECF Nos. 1, 19. She brings First Amendment claims against each defendant via 42 U.S.C. Section 1983. Specifically, she claims that the defendants violated the First Amendment

by (1) constructively terminating her in retaliation for protected speech and (2) withdrawing her severance offer in retaliation for protected speech. ECF No. 19 ¶¶ 71–78. She also alleges that Defendants conspired to violate her First Amendment rights. ECF No. 19 ¶¶ 79–85.

Defendants move to dismiss Rogers's claims. Buckingham and Patrick each filed their own motion. ECF Nos. 21 (Patrick), 22 (Buckingham). The Alamo Defendants move jointly. ECF No. 23. Patrick and Buckingham argue that (1) Rogers lacks standing; (2) they are entitled to sovereign immunity; (3) qualified immunity protects them from Rogers's claims; and (4) Rogers has not stated a First Amendment violation, regardless of qualified immunity. ECF Nos. 21, 22. The Alamo Defendants argue that (1) they were not acting under color of state law, as required to state a claim under Section 1983; (2) Rogers has not stated a First Amendment violation; (3) Wilson and Andrade are protected by qualified immunity; and (4) all of the Alamo Defendants are protected by sovereign immunity. ECF No. 23. Rogers filed responses, ECF Nos. 24–25, and Defendants filed replies, ECF Nos. 26–28. The Motions are ripe.

## DISCUSSION

### I. Legal Standards

a. <u>12(b)(1) Standard</u>

A 12(b)(1) motion seeks dismissal for lack of subject matter jurisdiction. FED. R. CIV. P. 12(b)(1). In ruling on a Rule 12(b)(1) motion, courts "take the well-pled factual allegations of the complaint as true and view them in the light most favorable to the plaintiff." *Stratta v. Roe*, 961 F.3d 340, 349 (5th Cir. 2020). However, a court may rely on: "(1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Freeman v. United States*, 556 F.3d 326, 334 (5th Cir. 2009). "Because [the] issue in a factual 12(b)(1) motion is the

trial court's jurisdiction[,] . . . the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Williamson v. Tucker*, 645 F.2d 404, 412–13 (5th Cir. 1981) (quoting *Mortensen v. First Fed. Sav. and Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977)). In short, the Court may resolve factual disputes to determine whether it has jurisdiction. *Id.* at 413. Materials such as affidavits and regulations can be considered when relevant. *Poindexter v. United States*, 777 F.2d 231 (5th Cir. 1985).

b. 12(b)(6) Standard

Federal Rule of Civil Procedure 12(b)(6) allows a party to move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Under the 12(b)(6) standard, a court cannot look beyond the face of the pleadings. *Baker v. Putnal*, 75 F.3d 190, 196 (5th Cir. 1996). To survive a 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. A claim for relief must contain: (1) "a short and plain statement of the grounds for the court's jurisdiction"; (2) "a short and plain statement of the claim showing that the pleader is entitled to relief"; and (3) "a demand for the relief sought." FED. R. CIV. P. 8(a). A plaintiff "must provide enough factual allegations to draw the reasonable inference that the elements exist." *Innova Hosp. S.A., L.P. v. Blue Cross & Blue Shield of Ga., Inc.*, 995 F. Supp. 2d 587, 602 (N.D. Tex. Feb. 3, 2014) (citing *Patrick v. Wal–Mart, Inc.-Store No. 155,* 681 F.3d 614, 617 (5th Cir. 2012)); *see also Torch Liquidating Tr. ex rel. Bridge Ass'ns. L.L.C. v. Stockstill*, 561 F.3d 377, 384 (5th Cir. 2009) ("[T]he complaint

must contain either direct allegations or permit properly drawn inferences to support every material point necessary to sustain a recovery." (quotation marks and citations omitted)).

In considering a 12(b)(6) motion, the complaint's factual allegations are taken as true, and the facts are construed in the light most favorable to the nonmoving party. *Fernandez-Montes v. Allied Pilots Ass'n*, 987 F.2d 278, 284 (5th Cir. 1993). Still, a complaint must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. "'[N]aked assertions' devoid of 'further factual enhancement,'" and "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not presumed true. *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557); *see also R2 Invs. LDC v. Phillips*, 401 F.3d 638, 642 (5th Cir. 2005) (stating that the Court should neither "strain to find inferences favorable to the plaintiffs" nor accept "conclusory allegations, unwarranted deductions, or legal conclusions").

As noted, a court generally cannot look beyond the pleadings in deciding a 12(b)(6) motion. *Baker*, 75 F.3d at 196. When a party presents "matters outside the pleadings" in this context, a court has "complete discretion" to either accept or exclude the evidence for purposes of determining the motion. *Isquith ex rel. Isquith v. Middle S. Utils., Inc.*, 847 F.2d 186, 196 n.3 (5th Cir. 1988); *accord Gen. Retail Serv., Inc. v. Wireless Toyz Franchise, LLC*, 255 F. App'x 775, 783 (5th Cir. 2007). But if "matters outside the pleading[s] are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56," and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." FED. R. CIV. P. 12(d).

Nevertheless, "pleadings" for purposes of a Rule 12(b)(6) motion include attachments to the complaint. *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007); *Collins v.*

*Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000). Similarly, the Court may "consider documents attached to either a motion to dismiss or an opposition to that motion when the documents are referred to in the pleadings and are central to a plaintiff's claim[]." *Brand Coupon Network*, 748 F.3d at 635 (internal quotation marks omitted); *see Walch v. Adjutant Gen.'s Dep't of Texas*, 533 F.3d 289, 293–94 (5th Cir. 2008) (determining reliance on documents attached to a response to a motion to dismiss appropriate where the documents were "sufficiently referenced in the complaint"). It is also "proper in deciding a 12(b)(6) motion to take judicial notice of matters of public record." *Norris v. Hearst Tr.*, 500 F.3d 454, 461 n.9 (5th Cir. 2007). As such, documents in these three categories may be considered without converting the motion to dismiss into a motion for summary judgment.

## II. Analysis

### a. Jurisdiction

The Court will first address its jurisdiction. *See Porretto v. City of Galveston Park Bd. of Trs.*, 113 F.4th 469, 481 (5th Cir. 2024) ("When a Rule 12(b)(1) motion is filed in conjunction with other Rule 12 motions, the court should consider the Rule 12(b)(1) jurisdictional attack before addressing any attack on the merits."). Patrick and Buckingham each assert that Rogers lacks standing to sue them. And all of the defendants argue that sovereign immunity—which is jurisdictional, *St. Maron Props., L.L.C. v. City of Houston*, 78 F.4th 754, 762 (5th Cir. 2023)—bars at least some of Rogers's claims against them.

#### *1. Standing*

Patrick and Buckingham argue that Rogers lacks standing. "Article III of the Constitution limits federal courts to deciding 'Cases' and 'Controversies.'" *Dep't of Com. v. New York*, 588 U.S. 752, 766 (2019). For a dispute to qualify as a "case or controversy" for Article III purposes,

"at least one plaintiff must have standing to sue." *Id.* To have standing, "[t]he plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016), *as revised* (May 24, 2016). The second requirement, "traceability," is sometimes referred to as "causation." *See Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024). "[P]laintiffs must demonstrate standing for each claim that they press against each defendant, and for each form of relief that they seek." *Murthy v. Missouri*, 603 U.S. 43, 61 (2024) (internal quotation marks omitted). "Where, as here, a case is at the pleading stage, the plaintiff must 'clearly . . . allege facts demonstrating' each element." *Spokeo*, 578 U.S. at 338. The parties do not dispute that Rogers adequately alleges an injury in fact.

A. Buckingham

Rogers has standing to sue Buckingham.

**i. Traceability**

First, Rogers's injury is "fairly traceable to [Buckingham's] allegedly unlawful conduct." *California v. Texas*, 593 U.S. 659, 668–69 (2021). "To establish traceability, [Rogers] must show 'a causal connection between the injury and the conduct complained of.'" *Estate of Parker v. Miss. Dep't of Pub. Safety*, 140 F.4th 226, 236 (5th Cir. 2025). This causation requirement "imposes no stringent or inflexible standard." *Id.* "[P]roximate cause need not be shown," and "[t]he defendant's conduct does not need to be 'the very last step in the chain of causation.'" *Reule v. Jackson*, 114 F.4th 360, 367 (5th Cir. 2024), *cert. denied,* 145 S. Ct. 1431 (2025). All that is required is "*de facto* causality." *Dep't of Com. v. New York*, 588 U.S. 752, 768 (2019). And "an indirect causal relationship will suffice." *Estate of Parker*, 140 F.4th at 236.

Still, "the links in the chain of causation[] must not be too speculative or too attenuated." *Pearson v. Shriners Hosps. for Child., Inc.*, 133 F.4th 433, 446 (5th Cir.), *cert. denied,* 146 S. Ct. 329 (2025). And where traceability "depends upon the decision of an independent third party," "it is ordinarily substantially more difficult to establish." *Book People, Inc. v. Wong*, 91 F.4th 318, 332 (5th Cir. 2024). In that context, a plaintiff "must show at the least 'that third parties will likely react in predictable ways.'" *Id.* Traceability can also be established where "the defendant's actions produce a 'determinative or coercive effect upon the action of someone else,' resulting in injury." *Reule*, 114 F.4th at 367.

As outlined above, Rogers has alleged that Buckingham exercised substantial control at the Alamo, including over some personnel-related decisions. About a week before Rogers was forced to resign, Buckingham made clear that she was opposed to anything "woke" being associated with the Alamo and would demand changes to that effect. *E.g.*, ECF No. 19 ¶ 53 (Buckingham's post stating that "[w]oke has no place at The Alamo."). She stated that she and the GLO would "implement[] a new process to ensure [her] office has oversight." *Id.* Just a week later, the Alamo Trust Board told Rogers that she had to resign or be terminated because "the State" demanded her termination. ECF No. 19 ¶ 59. Then, after Rogers sat for the interview with *Texas Monthly*, Alamo Trust rescinded a severance offer, and a board member felt compelled to ask permission from Patrick *and Buckingham* to restart negotiations—permission which was allegedly denied. ECF No. 19 ¶ 67. Those allegations support Rogers's assertion that Buckingham directed Rogers's termination and the withdrawal of her severance offer. So, Rogers has sufficiently alleged that Buckingham's conduct caused Rogers's alleged injuries.

**ii. Redressability**

Rogers has also adequately alleged redressability as to her claims against Buckingham. "[R]edressability requires the plaintiff to demonstrate 'that [their] injury would likely be redressed by judicial relief.'" *Diamond Alt. Energy, LLC v. Env't Prot. Agency*, 606 U.S. 100, 111 (2025). "To satisfy redressability, a plaintiff must show that 'it is *likely,* as opposed to merely *speculative*, that the injury will be redressed by a favorable decision.'" *Inclusive Cmtys. Project, Inc. v. Dep't of Treasury*, 946 F.3d 649, 655 (5th Cir. 2019) (emphasis in original). But "[t]he relief sought needn't completely cure the injury"; "it's enough if the desired relief would lessen it." *Id.*

Traceability and redressability "are often 'flip sides of the same coin.'" *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 380–81 (2024). "If a defendant's action causes an injury, enjoining the action or awarding damages for [it] will typically redress th[e] injury." *Id.* But "redressability 'can still pose an independent bar in some cases.'" *Diamond Alt. Energy*, 606 U.S. at 111–12.

Rogers brings claims against Buckingham both (1) in Buckingham's individual capacity for damages and (2) in Buckingham's official capacity for injunctive relief. *See* ECF No. 19 ¶ 104. Redressability is straightforward for the damages claims—the harm can be redressed by ordering Buckingham to pay damages. *See All. for Hippocratic Med.*, 602 U.S. at 381 ("If a defendant's action causes an injury, enjoining the action or awarding damages for the action will typically redress that injury.").

The claims for injunctive relief pose a harder question. Rogers asks the Court to "[d]irect[] Defendants, including . . . Buckingham in [her] official capacit[y], to reinstate Plaintiff as President and Chief Executive Officer of" Alamo Trust. ECF No. 19 ¶ 104. In this circuit, "governmental actors must have the legal authority to redress the plaintiff's injuries in order to

satisfy the redressability element." *Tap Pilam Coahuiltecan Nation v. Alamo Tr., Inc.*, No. 5:19-cv-01084-OLG, 2019 WL 10945421, at *4 (W.D. Tex. Dec. 23, 2019) (citing *Okpalobi v. Foster*, 244 F.3d 405, 427 (5th Cir. 2001)); *Freedom From Religion Found., Inc. v. Mack*, No. CV H-17-881, 2018 WL 6981153, at *3 (S.D. Tex. Sept. 27, 2018) ("Where a defendant has no authority to stop an illegal act, injunctive relief is 'utterly meaningless' and there is no Article III standing."); *see also Meyers v. JDC/Firethorne, Ltd.*, 548 S.W.3d 477, 487–89 (Tex. 2018) (Even if the defendant's "'influence' somehow contributed to" the challenged action, that "does not compel" a finding of redressability "when [the defendant] has no legal authority to remedy [the] alleged harm.").[6]

Buckingham claims that she and the GLO have "no official role" in Alamo Trust's personnel decisions—that is, that they have no legal authority to reinstate Rogers. Because this issue goes to the 12(b)(1) motion, the Court may look to Alamo Trust's bylaws and other evidence to help determine whether Buckingham and the GLO have such authority. *See, e.g.*, *Williamson*, 645 F.2d at 412–13. Under Alamo Trust's bylaws, its board "may designate an Executive Director . . . or Chief Executive Officer." ECF No. 22-1 at 6. The Management Contract between the GLO and Alamo Trust states that Alamo Trust "will have all rights and responsibilities of a manager, including, but not limited to, the right to supervise, hire, promote, discharge, transfer, or lay off employees." ECF No. 22-5 at 13. Alamo Trust has "the exclusive right to control all" of its employees. ECF No. 22-5 at 18. And "[a]ny employees hired by [Alamo Trust] shall be

[6] Plaintiff argues that what matters for redressability is the "substantive realities of the relationship," not formal authority. ECF No. 24 at 11–12. But the authorities Plaintiff cites for this argument do not concern redressability. *See, e.g.*, *Lindke v. Freed*, 601 U.S. 187, 197 (2024) (concerning Section 1983 and the First Amendment's state-action requirements); *Watson v. Graves*, 909 F.2d 1549, 1554 (5th Cir. 1990) (concerning employee status under the Fair Labor Standards Act); *Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 296 (2001) (concerning the Fourteenth Amendment's state-action requirement); *West v. Atkins*, 487 U.S. 42 (1988) (concerning Section 1983's state-action requirement).

employed directly by [Alamo Trust], and shall be under [its] management, direction and control . . . as provided by [the Management] Contract." ECF No. 22-5 at 28. Buckingham points to this language to argue that she and the GLO lack authority to reinstate Rogers.

But statutory provisions, other provisions in the Management Contract, and past practice suggest otherwise. By statute, the GLO is responsible for the Alamo. TEX. NAT. RES. CODE § 31.451. And Alamo Trust agreed in the Management Contract that it "will not take any actions that the GLO determines to be detrimental to the Alamo." ECF No. 22-5 at 19. If Alamo Trust "takes any such action that the GLO determines, in its reasonable opinion, to be materially detrimental, the GLO shall promptly notify [Alamo Trust] of this finding and instruct [it] to take corrective action." *Id.* If Alamo Trust does not take corrective action, the issue can be submitted for dispute resolution under the Management Contract. *Id.*

Further, even though "employees hired by [Alamo Trust] shall be employed directly by [Alamo Trust]," all "employment positions and details as to applicable duties allocated to each position shall be outlined and approved as part of" an annual Management Plan that Alamo Trust must submit to the GLO. ECF No. 22-5 at 15–16, 28. And if the GLO determines that an Alamo Trust employee "is incompetent . . . or detrimental to either (i) [Alamo Trust's] performance under the Management Plan or [Management] Contract, or (ii) GLO's statutory responsibilities for the Alamo, then the GLO may request that [Alamo Trust] remove that . . . employee from any activities related to the Alamo." ECF No. 22-5 at 28–29.

These provisions leave some ambiguity about the extent to which Buckingham and the GLO can instruct Alamo Trust to reinstate Rogers. On one hand, Alamo Trust has the authority to hire its employees and designate the CEO. But on the other, the GLO retains substantial, fairly ambiguous powers under the Management Contract, including a broad authority to instruct Alamo

Trust not to take actions "the GLO determines to be detrimental to the Alamo." ECF No. 22-5 at 19. It also retains at least some rights relating to employees and their responsibilities, ECF No. 22-5 at 15–16, 28–29, and, by statute, has ultimate authority over the Alamo.

As outlined above, Buckingham and the GLO have, in practice, exercised substantial control over Alamo Trust, including some personnel decisions. Between the GLO's statutory authority over the Alamo, the Management Contract provisions outlined above, and this past practice, the Court finds that Rogers has—at this stage—sufficiently shown that Buckingham has authority to reinstate her. So, Rogers has standing to sue Buckingham.

B. Patrick

Rogers has standing to sue Patrick for damages, but not for injunctive relief.

**i. Traceability**

Starting with traceability, Rogers alleges that Andrade promised that the Alamo Trust Board would back Rogers after Patrick said that she needed to resign. Then, Patrick called Andrade demanding that the Board terminate Rogers if she refused to resign. Andrade changed her tune and told Rogers to resign, or the Board would fire her, because "the State" demanded her termination. This sudden change in position suggests that Patrick's involvement "produce[d] a 'determinative or coercive effect upon the action of'" the Alamo Defendants, resulting in Rogers's forced resignation. *See Reule*, 114 F.4th at 367.

As to her severance offer, Rogers alleges that the Alamo Defendants withdrew the offer after Rogers sat for an interview with *Texas Monthly*. Patrick allegedly directed the Alamo Defendants to cease severance negotiations because of the interview and because of the article *Texas Monthly* published based on the interview. A board member later met with Patrick and Buckingham to ask permission to restart the negotiations. The allegations that a board member

had to ask Patrick and Buckingham whether they could recommence negotiations and that Patrick directed the Alamo Defendants to cease the negotiations suggest that Patrick's conduct was "determinative" of the Alamo Defendants' withdrawal from the severance negotiations.

**ii. Redressability**

Rogers's damages claims against Patrick are redressable for the same reasons that her damages claims against Buckingham are.

Rogers has not, however, shown that her injunctive-relief claims against Patrick are redressable. She does not dispute that Patrick lacks the formal authority to reinstate her. *See* ECF No. 24. She claims that "Texas law vests ultimate control of the Alamo with the State." ECF No. 24 at 12. But that statement is overbroad. Texas law vests ultimate control of the Alamo in *the GLO*, not "the State" in general, and not Patrick. *See* Tex. Nat. Res. Code § 31.451 ("The Alamo complex is under the jurisdiction of the land office."). So Rogers has not adequately alleged redressability as to her injunctive-relief claims against Patrick.

If the Court were to order Patrick to reinstate Rogers, he might be able to tell Alamo Trust or the GLO to do so. That statement might have some influence (though it also might not, especially if it is court-ordered). But they would not actually have to do anything. The order would not redress Rogers's injury. Conversely, if the Court were to order Alamo Trust and the GLO to reinstate Rogers, Patrick could not prevent the reinstatement. Perhaps he could retaliate against or criticize Alamo Trust, the GLO, or Rogers. But, if anything, that would give rise to a *separate* injury, not support a finding of redressability here.

Rogers's claims against Patrick for injunctive relief are **DISMISSED WITHOUT PREJUDICE** for lack of standing.

*2. Sovereign Immunity*

Patrick and Buckingham also argue that sovereign immunity bars Rogers's claims against them. The Alamo Defendants argue that, if they are state actors under Section 1983, sovereign immunity protects them as well.

A. Individual Capacity Claims Against Buckingham and Patrick

Sovereign immunity does not bar individual-capacity claims for damages. *See Lewis v. Clarke*, 581 U.S. 155, 163 (2017) ("[S]overeign immunity 'does not erect a barrier against suits to impose individual and personal liability.'"); *Corn v. Miss. Dep't of Pub. Safety*, 954 F.3d 268, 276 (5th Cir. 2020) (quoting *Lewis* and finding that sovereign immunity did not bar an individual-capacity First Amendment retaliation claim brought under Section 1983). So the Court has jurisdiction over Rogers's individual-capacity claims against Buckingham and Patrick.

B. Official-Capacity Claims Against Buckingham

Rogers's official-capacity claims against Buckingham fall within the *Ex parte Young* exception to sovereign immunity. Sovereign immunity generally renders states "immune from private suits unless they consent or unless Congress validly strips their immunity." *Tex. All. for Retired Ams. v. Scott*, 28 F.4th 669, 671 (5th Cir. 2022). However, the Supreme Court recognized an exception to this rule in *Ex parte Young*, 209 U.S. 123 (1908). *Tex. All. for Retired Ams. v. Scott*, 28 F.4th at 671. The *Ex parte Young* exception "permits plaintiffs to sue a state officer in his official capacity for an injunction to stop ongoing violations of federal law." *Id.* To proceed under the *Ex parte Young* exception, "a plaintiff must sue the right defendants and ask for the right remedy." *Jackson v. Wright*, 82 F.4th 362, 367 (5th Cir. 2023).

The defendant must have "'some connection with the enforcement' of the challenged" action. *Id.* In the First-Amendment-retaliation context, two "guideposts" are relevant to this

inquiry. *Id.* First, "[a]ll that is required is a mere scintilla of enforcement by the relevant state official with respect to the challenged law." *Id.* (cleaned up). Buckingham has "the required 'scintilla of enforcement' due to [her] governing authority over" Alamo Trust, as described above. *See id.*

Second, the defendant "must have more than 'the general duty to see that the laws of the state are implemented.'" *Id.* It is unclear whether and how this guidepost applies when, as here, the defendant played a direct role in the alleged violations.[7] But, regardless, it is enough for the relevant defendant to have "direct governing authority over the . . . officials that are allegedly" committing the continuing violation. *See Jackson*, 82 F.4th at 367–68. As discussed above, Rogers has—at this stage—sufficiently alleged that Buckingham and the GLO have authority over Alamo Trust and its personnel decisions.

As to remedy, the requested relief must be prospective. *E.g., Jackson*, 82 F.4th at 368. Relevant here, Rogers requests (1) declaratory relief that "the acts and practices complained of in [the Amended] Complaint are in violation of the First Amendment"; (2) an injunction against "these violations"; and (3) an order for Defendants to reinstate her as President and CEO of Alamo Trust. ECF No. 19 ¶ 104. "[A] request for reinstatement is sufficient to bring a case within the *Ex parte Young* exception." *Nelson v. Univ. of Tex. at Dall.*, 535 F.3d 318, 324 (5th Cir. 2008); *Corn*, 954 F.3d at 276 ("In *Warnock v. Pecos Cty.*, we stated that the *Ex parte Young* doctrine was an appropriate vehicle for pursuing reinstatement to a previous job position—as the case here. *See* 88 F.3d 341, 343 (5th Cir. 1996)."). Relatedly, termination is considered a "continuing

---

[7] *See id.* at 367–68 (finding cases applying this guidepost distinguishable because the defendants in those cases "had *no* role whatsoever in the alleged constitutional violations—not even a supervisory role over the individuals who were allegedly violating constitutional rights" (emphasis in original)); *Stamps v. Univ. of Tex. at Aus.*, No. 1:20-CV-01204-LY-SH, 2022 WL 526169, at *9 n.6 (W.D. Tex. Feb. 22, 2022) (finding opinions requiring the defendant to "both possess 'the authority to enforce the challenged law' and have 'a sufficient connection to the enforcement of the challenged act'" inapplicable to cases that "do[] not concern enforceability of a state statute").

violation" for purposes of the *Ex parte Young* exception. *See Nelson*, 535 F.3d at 324 n.5. The Court sees no reason to treat Rogers's claimed injury—constructive termination—differently. So Rogers's requested declaratory relief that the complained-of acts "*are* in violation of the First Amendment," ECF No. 19 ¶ 104 (emphasis added), and her requested injunctions against those violations are prospective in nature. *See Jackson*, 82 F.4th at 368 (finding declaratory relief stating that the defendants "*are violating*" the plaintiff's "rights under the First and Fourteenth Amendments by retaliating against him" prospective (emphasis in original)).

C. The Alamo Defendants

The Alamo Defendants are not entitled to sovereign immunity, because "the 'exceptional freedom from legal responsibility' that sovereign immunity offers is 'confined' to the sovereign entity itself." *Geo Grp., Inc. v. Menocal*, 607 U.S. 438, 450 (2026). "A private contractor cannot obtain '[i]mmunity from suit' by 'reason of a contract' it made with the Government." *Id.*

That said, a state's sovereign immunity "extends to so-called arms of the state, entities which are effectively the state itself." *Springboards to Educ., Inc. v. McAllen Indep. Sch. Dist.*, 62 F.4th 174, 178 (5th Cir. 2023). The Alamo Defendants do not argue that they are "arms of the state," and such an argument would lack merit. Alamo Trust and the Foundation are nonprofits—legally separate from the state of Texas—and Andrade and Wilson are individuals. Such entities are rarely, if ever, arms of the state for sovereign-immunity purposes. *See Galette v. N.J. Transit Corp.*, 607 U.S. 509, 536 (2026) (noting a "long line of cases in which [the Supreme Court] has found state-created corporations that are formally liable for their own judgments not to be arms of the States that created them"); *In re Entrust Energy, Inc.*, 101 F.4th 369, 384 (5th Cir. 2024) (noting that nonprofits in Texas "can 'incur liabilities' and 'borrow money'" (quoting TEX. BUS. ORGS. CODE § 2.101(6))). The Alamo Defendants have presented nothing to suggest that the Court

should depart from that rule here. *See Springboards to Educ.*, 62 F.4th at 179 ("The burden of proof" on the arm-of-the-state issue "rests with the entity asserting immunity."). So they are not entitled to sovereign immunity.

*3. Summation*

The Court has jurisdiction over all of Rogers's claims against Buckingham and the Alamo Defendants, as well as Rogers's individual-capacity claims against Patrick.

b. <u>Merits</u>

To state a claim under Section 1983, "a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *Gomez v. Galman*, 18 F.4th 769, 775 (5th Cir. 2021). But even if those requirements are met, "[t]he doctrine of qualified immunity protects government officials from civil damages liability" if the right they allegedly violated was not "'clearly established' at the time of the challenged conduct." *Anderson v. Valdez*, 845 F.3d 580, 599–600 (5th Cir. 2016) (alteration in original).

The Alamo Defendants argue that they did not act under color of state law. All of the defendants argue that Rogers has failed to allege the violation of a right. And Patrick, Buckingham, Wilson, and Andrade argue that, even if Rogers alleged a violation, they are protected by qualified immunity because the relevant right was not "clearly established." The Court will address each of those issues in turn.[8]

[8] Alamo Trust and the Foundation briefly argue that they are not "persons" who can be sued under Section 1983. ECF No. 23 at 13. For this argument, they rely on cases holding that states, state officials sued for damages in their official capacities, and arms of the state are not "persons" under Section 1983. *See Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989); *Wren v. Midwestern State Univ.*, No. 7:18-CV-00060-O-BP, 2019 WL 3099408, at *6 (N.D. Tex. June 25, 2019) (citing *Stotter v. Univ. of Tex. at S.A.*, 508 F.3d 812, 821 (5th Cir. 2007), to hold that a university is not a "person" under Section 1983), *report and recommendation adopted sub nom. Wren v. Midwestern State Univeristy*, No. 7:18-CV-00060-O-BP, 2019 WL 3081849 (N.D. Tex. July 15, 2019); *Stotter*, 508 F.3d at 821 (holding that "state universities *as arms of the state* are not 'persons' under § 1983" (emphasis added)). That rule does not extend to nonprofits that are not arms of the state. *See Will*, 491 U.S. at 69 (relying in part on the distinction between

*1. Whether the Alamo Defendants Acted Under Color of State Law*

Rogers has sufficiently alleged that the Alamo Defendants acted under color of state law. The "critical inquiry" in determining whether a private entity or individual acted under color of state law is whether "the alleged infringement of federal rights [can be] fairly attributable to the State." *Cornish v. Corr. Servs. Corp.*, 402 F.3d 545, 549 (5th Cir. 2005) (alteration in original). There are "a number of tests for deciding whether" that is the case. *Id.* at 549–50 (collecting cases and summarizing tests). For example, a private entity can qualify as a state actor when (i) it "performs a traditional, exclusive public function;" (ii) "the government compels the private entity to take a particular action"; (iii) "the government acts jointly with the private entity"; or (iv) "the private entity is entwined with governmental policies, or . . . government is entwined in its management or control." *Pearson*, 133 F.4th at 443–44.

For all of these tests, the first step is "identifying the specific conduct of which the plaintiff complains." *Id.* at 444. Here, Rogers complains about the Alamo Defendants forcing her to resign and withdrawing a severance offer, both in retaliation for First-Amendment-protected speech.

To argue that the Alamo Defendants acted under color of state law, Rogers principally relies on the two-part test articulated in *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982). *See* ECF No. 25 at 4–9. Under this test, "the deprivation of a federal right could fairly be attributable to the state" if: (1) "the deprivation [was] caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible" and (2) the defendant is "a person who may fairly be said to be a state actor." *Ballard v. Wall*, 413 F.3d 510, 518 (5th Cir. 2005).

---

corporations and states). And it does not bar Rogers's official-capacity claims against Patrick and Buckingham, because "a state official in his or her official capacity, when sued for injunctive relief, [is] a person under [Section] 1983." *Id.* at 71 n.10 (emphasis added).

Starting with the first prong, no one disputes that Patrick and Buckingham are "person[s] for whom the State is responsible." And, for the same reasons Rogers adequately alleged traceability for standing purposes, she has adequately alleged that Patrick and Buckingham caused the relevant deprivations of federal rights by directing Rogers's forced resignation and the withdrawal of her severance offer. So Rogers has adequately alleged that relevant deprivations were "caused by . . . a person for whom the State is responsible." *See id.*

Rogers has also adequately alleged the second prong. This prong is met if the defendant "is a 'joint participant' with a state official in the offending enterprise." *Id.*; *see also Dennis v. Sparks*, 449 U.S. 24, 27–28 (1980) ("Private persons, jointly engaged with state officials in the challenged action, are acting see [sic] 'under color' of law for purposes of § 1983 actions."). Starting with the withdrawal of severance: Patrick and Buckingham allegedly directed the Alamo Defendants to withdraw the severance offer, and the Alamo Defendants did so as a result. The Alamo Defendants were thus "joint participant[s]" with state officials in the withdrawal.

As to the forced resignation, Rogers has adequately alleged that Alamo Trust, Wilson, and Andrade were joint participants with state officials.[9] As described above, Patrick and Buckingham allegedly directed Alamo Trust to fire Rogers. As a result, Andrade, Wilson, and Alamo Trust played critical roles in forcing Rogers to resign—most notably, they threatened to terminate her if she didn't. So they "joint[ly] participa[ted]" in forcing Rogers to resign.

In short, Rogers has adequately alleged that Andrade, Wilson, and Alamo Trust acted under color of state law in their conduct related to both of Rogers's alleged injuries. And she has

[9] For separate reasons outlined below, Rogers has not stated a claim against the Foundation based on her forced resignation. So the Court need not determine whether she has adequately alleged that the Foundation acted under color of state law in association with the resignation.

adequately alleged that the Foundation acted under color of state law in association with the withdrawal of her severance offer.

*2. First Amendment Retaliation*

Rogers has adequately stated a First Amendment claim against each defendant except the Foundation. "Claims by governmental contractors that their speech caused retaliation against them by the government are analyzed using the same framework as that for claims by public employees." *Culbertson v. Lykos*, 790 F.3d 608, 618 (5th Cir. 2015). To establish a claim under this framework, Rogers must show that: "(1) [s]he suffered an adverse employment action; (2) [s]he spoke as a citizen on a matter of public concern; (3) [her] interest in the speech outweighs the government's interest in the efficient provision of public services; and (4) the speech precipitated the adverse employment action." *Anderson*, 845 F.3d at 590.

A. Rogers's Forced Resignation

Rogers has adequately alleged that all of the defendants except the Foundation retaliated against her in violation of the First Amendment by forcing her to resign.

**i. The Foundation**

The Foundation is generally under Alamo Trust's control. *See* ECF No. 19 ¶ 10; 26 U.S.C. § 509(a)(3). But Rogers has not explained how it played a role in forcing her resignation. And the Amended Complaint does not contain any allegations suggesting that it did so. Rogers's claim against the Foundation based on her forced resignation is thus **DISMISSED WITHOUT PREJUDICE.**

**ii. Adverse Employment Action**

Adverse employment actions in this context include, among other things, "discharges, demotions, refusals to hire, refusals to promote," and reprimands. *Caldwell v. Lozano*, 689 F.

App'x 315, 319 (5th Cir. 2017). Most relevant here, an employee's "constructive discharge" is an adverse employment action. *Id.* (quoting *Kline v. N. Tex. State Univ.*, 782 F.2d 1229, 1234 (5th Cir. 1986)).

"An employee who resigns may demonstrate constructive discharge by two means." *David v. Pointe Coupee Par. Sch. Bd.*, 247 F.3d 240 (5th Cir. 2001) (unpublished). "First, she can 'offer evidence that the employer made [her] working conditions so intolerable that a reasonable employee would feel compelled to resign.'" *Id.* (alteration in original). Second, "constructive discharge occurs 'if the employer gives the employee an ultimatum to quit or be fired.'" *Lee v. Mission Chevrolet, Ltd.*, No. EP-16-CV-00034-DCG, 2017 WL 4784368, at *15 (W.D. Tex. Oct. 23, 2017) (citing *Perret v. Nationwide Mut. Ins. Co.*, 770 F.3d 336, 338 (5th Cir. 2014)); *Caldwell*, 689 F. App'x at 320 (same); *David*, 247 F.3d 240.

Rogers relies on the second option. The Amended Complaint alleges that Andrade—after consulting with Patrick, Wilson, and potentially Buckingham—directly told Rogers that she had to resign or would be fired. That is "an ultimatum that left [Rogers] with the choice to either resign or be fired." *David*, 247 F.3d 240. So Rogers has adequately alleged constructive discharge.

#### iii. Whether Rogers Spoke as a Citizen on a Matter of Public Concern

Rogers has also adequately alleged that, in her dissertation, she spoke as a citizen on a matter of public concern. If a public employee or contractor did not speak "as a citizen on a matter of public concern," they have "no First Amendment cause of action based on [their] employer's reaction to the speech." *Lane v. Franks*, 573 U.S. 228, 237 (2014) (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006)). "[A]ddressing this issue requires two separate inquiries." *Bevill v. Wheeler*, 103 F.4th 363, 375 (5th Cir. 2024). "First, with respect to the speech at issue," the

plaintiff must have "spoke[n] as a *citizen* and not as an *employee*." *Id.* (emphasis in original). Second, the speech must have "raised a matter of public concern." *Id.*

Defendants do not dispute that Rogers's statements raised "a matter of public concern." *See also Lane*, 573 U.S. at 241 ("Speech involves matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." (cleaned up)). Instead, they argue that the statements in her dissertation were made in her capacity as an employee of Alamo Trust, not as a citizen.

Rogers was speaking "as a citizen" unless she made the relevant statements "pursuant to [her] official duties." *Anderson*, 845 F.3d at 593 (emphasis omitted). This is a "practical inquiry" that "focuses solely on whether the speech was performed 'within the scope of the employee's professional duties.'" *Gibson v. Kilpatrick*, 773 F.3d 661, 667 (5th Cir. 2014). Someone does not speak pursuant to their official duties "merely because [they] speak[] while *at* work" or because they speak "*about* work." *Anderson*, 845 F.3d at 593 (emphasis in original). And "when there is an analogue to speech by citizens who are not public employees, the employee does not speak pursuant to [their] official duties, but as a citizen." *Id.* at 594.

Here, the relevant speech is Rogers's dissertation, or at least portions thereof. Rogers prepared the dissertation as part of a doctoral program she began before she worked for Alamo Trust, and "Alamo Trust did not fund or sponsor this degree in any way." ECF No. 19 ¶ 46. Her speech has a clear analogue to speech by citizens who are not public employees—private citizens regularly write and publish dissertations, theses, and other scholarship, including in pursuit of degrees. *Cf. Garcetti*, 547 U.S. at 425 ("There is some argument that expression related to

academic scholarship or classroom instruction implicates additional constitutional interests that are not fully accounted for by [the] customary employee-speech jurisprudence.").

The dissertation referred to the Alamo and to Rogers's role there. Indeed, it said that Rogers's study was, in part, meant "to help inform future programming at the Alamo." ECF No. 21-1 at 21. But it did not claim to speak on behalf of Alamo Trust, and it was not attributable to Alamo Trust. Rogers seemingly discussed her job primarily to disclose to the reader how that perspective might affect the qualitative study underlying the dissertation. *See* ECF No. 21-1 at 79–81 ("Perhaps the biggest dilemma for me as a researcher and the actual 'instrument' in this qualitative study had to do with my own political views and my current environment.").

The dissertation was about "how history and social studies teachers . . . can engage in ongoing and high-quality professional development opportunities." ECF No. 21-1 at 10. It was meant "to help the staff at the Alamo *as well as other museums and historic sites across the country* . . . ." ECF No. 21-1 at 81 (emphasis added). Rogers wrote it in pursuit of a degree that she sought for herself, without support from Defendants. Alamo Trust did not "commission[] or create[]" the dissertation, and the relevant speech does not "owe[] its existence to" Rogers's "professional responsibilities." *Garcetti*, 547 U.S. at 421–22.[10] Rogers's acknowledging that her study would inform her work at the Alamo, discussing the politics surrounding the Alamo, and

[10] As a formalistic matter, Rogers's statements about her role at the Alamo arguably "owe[] [their] existence to" her professional responsibilities in the sense that she would not have made the statements if she did not work for Alamo Trust. But speaking about one's job, or even speaking with "the imprimatur of [one's] position," does not necessarily render speech unprotected. *See, e.g.*, *Bevill v. Fletcher*, 26 F.4th 270, 277 (5th Cir. 2022) (allowing retaliation claim to proceed where the plaintiff "prominently presented" his job title on the relevant document, "thereby giving [it] the imprimatur of his position"); *Lane*, 573 U.S. at 240 ("[T]he mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into employee—rather than citizen—speech."). Whether speech "owes its existence to a public employee's professional responsibilities" depends on more than but-for causation; it depends on whether the speech can be attributed to the employer. *See Garcetti*, 547 U.S. at 421–22 ("Restricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen. It simply reflects the exercise of employer control *over what the employer itself has commissioned or created*." (emphasis added)).

acknowledging that she remained "constantly . . . vigilant about the political ramifications" of her study does not transform what is fundamentally personal speech into official speech.[11]

Buckingham argues that because Rogers's job at the Alamo sometimes required her to speak publicly "on behalf of and concerning the Alamo," her public speech about the Alamo was pursuant to her official duties. ECF No. 22 at 28. This theory would seemingly mean that a government employee or contractor whose job includes speaking publicly on a particular issue could never speak publicly about that issue in their capacity as a citizen. The Court declines to adopt such a broad rule, because "no single fact or factor is dispositive" of whether someone spoke pursuant to their official duties; "[t]here is no heuristic" in this context. *Gibson*, 773 F.3d at 670.[12]

Buckingham cites language from *Gibson v. Kilpatrick* that could, in isolation, support her position. *See* ECF No. 22 at 29 (citing *Gibson*, 773 F.3d at 670). The plaintiff in *Gibson* was a police chief who reported the mayor of his town "to outside law enforcement agencies for misuse of the city gasoline card." *Gibson*, 773 F.3d at 664. The Fifth Circuit acknowledged in *Gibson* that complaints made to outside actors "are ordinarily not made as an employee, but as a citizen." *Id.* at 670. But, the Fifth Circuit emphasized, "that is only *ordinarily* the case," because—again—"no single fact or factor is dispositive." *Id.* To illustrate that point, the Fifth Circuit made the

[11] Further, Rogers's *study* is separate from her *speech*. Defendants emphasize that the *study* was partially meant to inform Rogers's work at the Alamo. But the choice to *write* about the study is a separate matter.

[12] Buckingham also claims that Rogers's statements about the Alamo and Alamo Trust were "within the supervision and control of the [Alamo Trust Board]." ECF No. 22 at 28 (citing *Anderson*, 845 F.3d at 596 ("Whether the employer was entitled to control the employee's speech determines whether that speech was made pursuant to the employee's official duties.")). Buckingham does not meaningfully explain how any of the Defendants had the right to control any aspect of Rogers's dissertation. And even assuming the Court can, at this stage, consider the provisions of the bylaws and Management Contract Buckingham cites for this argument, those provisions speak only in general terms and do not self-evidently allow Alamo Trust to control Rogers's speech in her dissertation. *See* ECF No. 22 at 28 (citing ECF No. 22-1 ¶¶ 3.01 (The Alamo Trust Board "will manage [Alamo Trust's] corporate affairs."), 4.06 (The Alamo Trust Board "may designate an Executive Director" or "Chief Executive Officer," who "shall be responsible for the general and active management of the operations of" Alamo Trust . . . .); ECF No. 22-5 ¶¶ 3.04(a)(v) (Alamo Trust shall, "[i]n consultation with the GLO . . . manage the marketing efforts and communication strategies for the Alamo and the implementation of the Alamo Plan."), 3.13 (describing Alamo Trust's responsibility for its employees)).

statement on which Buckingham relies: "For when an employee's official duties include communicating with outside agencies or the press, it would be in dissonance with *Garcetti* to conclude that, when he does so, he enjoys First Amendment protection." *See id.* The point of that sentence was to illustrate that absolute rules are *not* appropriate in determining whether a plaintiff spoke as a citizen. So the statement is best understood to simply mean that outside communications can in some cases be made as an employee, particularly where a plaintiff's job includes making such communications.

The relevant statements in Rogers's dissertation were made in her capacity as a citizen on a matter of public concern.

**iv. Balance of Interests**

In-depth discussion of the third element—whether Rogers's "interest in the [relevant] speech outweighs the government's interest in the efficient provision of public services," *Anderson*, 845 F.3d at 590—is unnecessary at this stage. *See, e.g.*, *Cox v. Kaelin*, 577 F. App'x 306, 312 (5th Cir. 2014). "At the motion to dismiss stage, the Court need not consider this prong of the test for First Amendment retaliation claims against state officials." *Zuniga v. Yeary*, No. 1:18-CV-434-RP, 2020 WL 1329908, at *4 (W.D. Tex. Mar. 20, 2020); *see also Fletcher*, 26 F.4th at 275–79 & n.4 (analyzing whether the plaintiff spoke in his capacity as a citizen and then stating, "the analysis above is enough to conclude that [the plaintiff] has adequately pled both the second and third elements of his First Amendment retaliation claim").

**v. Causation**

The final element—causation—is straightforward here. As described above, Rogers has sufficiently alleged that Defendants forced her to resign because of her dissertation. Patrick allegedly said that he wanted Rogers to resign or be fired because of the dissertation. ECF No. 19

¶¶ 57–59. Andrade and Wilson agreed to force Rogers out after Patrick read Andrade portions of the dissertation. ECF No. 19 ¶ 59. And, although Rogers's allegations against Buckingham are less specific on this issue, they are sufficient for the same reasons they are as to traceability. Buckingham exercised substantial control at the Alamo. And just a week after she stated that "[w]oke has no place at the Alamo" and that she would "implement[] a new process to ensure [her] office has oversight," ECF No. 19 ¶ 53, Rogers was forced out because of the dissertation. That is sufficient to allege that Buckingham was involved. Rogers has adequately alleged causation.

B. Withdrawal of Rogers's Severance Offer

The next issue is whether Rogers has adequately pleaded a First-Amendment violation based on the alleged withdrawal of her severance offer.

**i. Standard**

As noted above, claims for retaliation against government contractors are analyzed under the public-employee retaliation standard. But First Amendment retaliation claims against private citizens are analyzed under a different framework, which requires a plaintiff to prove:

> (1) they were engaged in constitutionally protected activity, (2) the defendants' actions caused them to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity, and (3) the defendants' adverse actions were substantially motivated against the plaintiffs' exercise of constitutionally protected conduct.

*Brinsdon v. McAllen Indep. Sch. Dist.*, 863 F.3d 338, 351 (5th Cir. 2017), *as revised* (July 3, 2017) (quoting *Keenan v. Tejeda*, 290 F.3d 252, 258 (5th Cir. 2002)).

It is not immediately clear which of these standards applies here. On one hand, Rogers did not work for Alamo Trust when she participated in the speech that allegedly led to the withdrawal of her severance offer; she was a private citizen at the time. But, on the other, the severance

negotiations and offer grew directly out of her work for a government contractor, which might suggest that the government-contractor standard is more appropriate.

The public-employee and public-contractor retaliation standard is based on the government's heightened "interest in achieving its goals as effectively and efficiently as possible" when it "acts as employer" or contract holder, as opposed to when it "acts as sovereign." *Bd. of Cnty. Comm'rs, Wabaunsee Cnty., Kan. v. Umbehr*, 518 U.S. 668, 676 (1996). Because Defendants were acting as employers and contract holders, and not as "sovereigns," when engaging in severance negotiations with Rogers—and because no party meaningfully argues why the private-citizen standard should apply here—the Court will apply the standard applicable to public employees and government contractors.

**ii. Adverse Employment Action**

Rogers has sufficiently alleged that the withdrawal of her severance offer was an adverse employment action. As noted above, adverse employment actions include "discharges, demotions, refusals to hire, refusals to promote, and reprimands." *Lowery v. Mills*, 157 F.4th 729, 743 (5th Cir. 2025), *cert. denied,* No. 25-927, 2026 WL 1855135 (U.S. June 29, 2026). The Fifth Circuit takes a "narrow view of what constitutes an adverse employment action" in this context and has generally "declined to expand the list of actionable" adverse employment actions. *Id.* Still, actions that are functionally—though not directly—"discharges, demotions, refusals to hire, refusals to promote, [or] reprimands" count,[13] as do actions that are "sufficiently punitive"[14] or that otherwise

[13] *Sharp v. City of Houston*, 164 F.3d 923, 933 (5th Cir. 1999) ("[A]n adverse employment action can include a transfer, because it may serve as a demotion."); *see also Caldwell*, 689 F. App'x at 319 (noting that constructive discharges can be the basis for a First-Amendment-retaliation claim).

[14] *See Oller v. Roussel*, 609 F. App'x 770, 772–73 (5th Cir. 2015) ("[S]ome other actions, such as transfers, may be adverse employment actions when they are 'sufficiently punitive.'"); *Pierce v. Texas Dep't of Crim. Just., Institutional Div.*, 37 F.3d 1146, 1150 (5th Cir. 1994) (finding that an assignment was not an adverse employment action because it did "not amount to a sanction").

affect "important conditions of employment."[15] "[M]ere accusations or criticism," "investigations," and "false accusations" are not adverse employment actions. *Lowery*, 157 F.4th at 743.

The withdrawal of the severance offer was an adverse employment action for at least three reasons. First, it is analogous to a refusal to promote in that it deprived Rogers of potential income. *See also Click*, 970 F.2d at 110 ("Loss of an opportunity for promotion is cognizable under § 1983."). Second, it was sufficiently punitive to constitute a sanction, for the same reason. *See Oller*, 609 F. App'x at 772 ("[S]ome other actions, such as transfers, may be adverse employment actions *when they are 'sufficiently punitive'* . . . ." (emphasis added)). Finally, even if the withdrawal were not closely analogous to a refusal to promote and were not sufficiently punitive, it certainly involved "important conditions of employment." *See Click*, 970 F.2d at 109.

The Fifth Circuit has held "in the education context" that "decisions concerning teaching assignments, pay increases, administrative matters, and departmental procedures" are not adverse employment actions. *Breaux v. City of Garland*, 205 F.3d 150, 157 (5th Cir. 2000) (cleaned up) (quoting *Harrington v. Harris*, 118 F.3d 359, 365 (5th Cir. 1997)). The withdrawal of the severance offer was at least arguably a "decision concerning . . . [a] pay increase[]" or an "administrative matter[]." But the rule that such decisions are not adverse employment actions is limited to the education context,[16] which courts are particularly "hesitant to invade and take over."

[15] *Click v. Copeland*, 970 F.2d 106, 109 (5th Cir. 1992) ("Where . . . important conditions of employment are involved, a public employee will not be foreclosed from § 1983 relief merely because the impermissible retaliation did not result in the termination of his employment." (alteration in original)).

[16] *Lowery*, 157 F.4th at 741 ("*In the education context*, decisions concerning teaching assignments, pay increases, administrative matters, and departmental procedures do not rise to the level of a constitutional deprivation." (cleaned up) (emphasis added)); *Breaux*, 205 F.3d at 157 ("*[I]n the education context*, this court has held . . . ." (emphasis added)); *Oller*, 609 F. App'x at 773 ("We have been particularly reluctant to interfere with decisionmaking *in the academic context*. Many of the decisions *made at schools and universities*—such as decisions 'concerning teaching assignments, pay increases, administrative matters, and departmental procedures'—are not the kinds of adverse actions that 'rise to the level of a constitutional deprivation.'" (emphasis added)).

*Doe v. Eanes Indep. Sch. Dist.*, No. A-19-CV-00538-LY, 2019 WL 5693767, at *6 (W.D. Tex. Nov. 4, 2019); *see also Oller*, 609 F. App'x at 773 ("We have been particularly reluctant to interfere with decisionmaking in the academic context."). The Fifth Circuit has conspicuously omitted "decisions concerning . . . assignments, pay increases, administrative matters, and departmental procedures" from lists of things that more generally are not adverse employment actions, even in the same opinions that acknowledge that such actions are not sufficient "in the education context." *See Lowery*, 157 F.4th at 741, 743; *Breaux*, 205 F.3d at 157–58.[17]

**iii. Whether Rogers Spoke as a Citizen on a Matter of Public Concern**

Defendants seemingly do not contest that Rogers spoke as a citizen on a matter of public concern when she sat for her interview with *Texas Monthly*. The Alamo Defendants briefly mention that "[i]n the article" (it is unclear whether "the article" refers to the *Texas Monthly* article or to a profile of Rogers on USC's website) Rogers discussed "points that she discussed in her dissertation" and "points that violated her fiduciary duties and confidentiality obligations." ECF No. 23 at 28–29. But, as outlined above, Rogers has adequately pleaded that the dissertation was speech as a citizen on a matter of public concern. The interview is not official speech just because it addressed similar topics. And the Court declines to rely on the Alamo Defendants' conclusory assertion that Rogers breached fiduciary and confidentiality obligations. Regardless, a breach of such obligations would not independently render her speech official in nature. *See Fletcher*, 26

[17] Further, cases holding that decisions involving pay increases are not adverse employment actions often quote *Harrington v. Harris*, 118 F.3d 359, or cases citing it, for that proposition. *See, e.g.*, *Breaux*, 205 F.3d at 157; *Lowery*, 157 F.4th at 741. But the plaintiffs in *Harrington* complained about the *amount* by which their pay was increased, not the *absence* of a pay increase. 118 F.3d at 366. Their pay increases did not vary significantly from their coworkers'. *Id.* And the Fifth Circuit said, "If Plaintiffs had received no merit pay increase at all or if the amount of such increase were so small as to be simply a token increase which was out of proportion to the merit pay increases granted to others, we might reach a different conclusion." *Id.* So, even in the education context, *Harrington* does not hold that decisions concerning pay increases can *never* constitute adverse employment actions.

F.4th at 278 (finding that a plaintiff "could not have acted for the benefit and subject to the control of his employer when he engaged in speech against his employer's interest").

**iv. Balance of Interests**

As noted above, the Court need not engage in element three's fact-intensive balancing test at this stage. *See, e.g.*, *Cox*, 577 F. App'x at 312, *Zuniga*, 2020 WL 1329908, at *4; *Fletcher*, 26 F.4th at 275–79 & n.4.

**v. Causation**

Rogers has adequately alleged causation. The Alamo Defendants allegedly withdrew the severance offer "[i]mmediately" after finding out about the interview. ECF No. 19 ¶ 66. Rogers alleges that Buckingham and Patrick directed the withdrawal. ECF No. 19 ¶ 72. There are sufficient factual allegations to support that claim, because Buckingham and Patrick exercised significant control at Alamo Trust and had expressed disapproval of Rogers's prior statements similar to those in the interview. Beyond that, an Alamo Trust board member allegedly felt the need to ask Buckingham and Patrick's permission to restart severance negotiations. ECF No. 19 ¶ 67. After Buckingham and Patrick denied permission, the severance negotiations did not resume. *Id.* That, and the temporal proximity between when Defendants found out about the interview and when they withdrew the offer, are sufficient to allege that Rogers's speech in association with the *Texas Monthly* interview and article precipitated the withdrawal of her severance offer. *See Mooney v. Lafayette Cnty. Sch. Dist.*, 538 F. App'x 447, 454 (5th Cir. 2013) ("Close timing between an employee's protected activity and an adverse employment action can be a sufficient basis for a court to find a causal connection required to make out a prima facie case of retaliation."); *see also Haverda v. Hays Cnty.*, 723 F.3d 586, 595 (5th Cir. 2013) ("[S]ummary disposition of the causation issue in First Amendment retaliation claims is generally inappropriate.").

C. Patrick and Buckingham's First Amendment Rights

Patrick and Buckingham argue that their challenged conduct consisted of speech, so allowing Rogers's claims to proceed would infringe on their First Amendment rights. They rely primarily on a statement from the Fourth Circuit that "where a public official's alleged retaliation is in the nature of speech, in the absence of a threat, coercion, or intimidation intimating that punishment, sanction, or adverse regulatory action will imminently follow, such speech does not adversely affect a citizen's First Amendment rights, even if defamatory." *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 687 (4th Cir. 2000).

The most obvious problem with this argument is that this case involves a "threat, coercion, or intimidation intimating that punishment, sanction, or adverse . . . action will imminently follow," *id.*—Defendants told Rogers that she would be fired if she did not resign. This case also involves concrete adverse employment actions beyond mere speech. Even if Buckingham and Patrick's actions were not the final step in the causal chain, "the right of a plaintiff to be free from governmental officials' exerting their power or influence over a third-party employer to cause the plaintiff to be [subject to adverse employment action] for exercising his First Amendment rights" is clearly established in this circuit. *Fletcher*, 26 F.4th at 282–83.

Patrick and Buckingham's argument might have more strength if they had simply expressed frustration or disappointment with Rogers's statements, or even if they had stopped at publicly stating that Rogers should resign. But they allegedly went further by using their power and influence to direct Rogers's constructive termination from an entity over which they exercised significant control, in response to protected speech. That they engaged in speech while doing so does not shield them from liability. *See Colson v. Grohman*, 174 F.3d 498, 513 (5th Cir. 1999)

("[R]etaliatory criticisms, investigations, and false accusations *that do not lead to some more tangible adverse action* are not actionable under § 1983." (emphasis added)).[18]

D. Summation

In sum, Rogers has sufficiently alleged that (1) all of the Defendants except the Foundation retaliated against her in violation of the First Amendment by forcing her to resign because of her dissertation and (2) all of the Defendants retaliated against her in violation of the First Amendment by withdrawing her severance offer because she sat for an interview with *Texas Monthly*.

3. *Conspiracy*

Rogers also claims that Defendants conspired to retaliate against her in violation of the First Amendment. *See* ECF No. 19 ¶¶ 79–85. "To state a claim for conspiracy under [Section] 1983, a plaintiff must allege the existence of (1) an agreement to do an illegal act and (2) an actual constitutional deprivation." *Fletcher*, 26 F.4th at 274–75. Rogers has pleaded "an actual constitutional deprivation" for the reasons stated above. "The question, then, is whether [she has] adequately averred that Defendants had an agreement to violate [her] constitutional rights under the color of state law." *Id.* at 283.

Rogers's allegations that Buckingham and Patrick directed the adverse actions and that the Alamo Defendants agreed to undertake them are sufficient to plead such an agreement at this stage. *See Rodriguez v. Child.'s All. of S. Tex.*, No. SA-17-CV-599-XR, 2018 WL 523213, at *3, *5 (W.D. Tex. Jan. 23, 2018) (finding that a plaintiff had sufficiently pleaded a conspiracy claim

---

[18] Patrick has also allegedly invoked the Texas Legislature's investments in the Alamo to exert control at Alamo Trust. *See* ECF No. 19 ¶ 42 (Patrick allegedly told Rogers to cancel a meeting over Buckingham's objection because "the [L]egislature has over 600 million invested in the Alamo and we have a right to have a say in that investment." (alteration in original)). This further suggests that Patrick's actions went beyond mere speech and included "exerting [his] power or influence" to force Rogers out. *See Fletcher*, 26 F.4th at 273 (relying on, e.g., threats to withhold resources from the employer).

against her employer, her employer's director, and several public officials where one of the public officials had demanded to the director that the plaintiff retract a statement, the officials had conspired to pull funding from the employer if the director did not terminate the plaintiff, and the director terminated the plaintiff). But, as with the underlying First Amendment claim, Rogers has not alleged that the Foundation played any role in forcing her resignation or conspiring to do so. So her conspiracy claim against the Foundation is **DISMISSED WITHOUT PREJUDICE** insofar as it is based on her alleged forced resignation.

4. *Qualified Immunity/Clearly Established Right*

That leaves qualified immunity. "[T]he doctrine of qualified immunity protects government officials from civil damages liability when their actions could reasonably have been believed to be legal." *Anderson*, 845 F.3d at 599 (quoting *Morgan v. Swanson*, 659 F.3d 359, 370 (5th Cir. 2011)). "[A] plaintiff seeking to defeat qualified immunity must show: (1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." *Id.* at 600 (cleaned up). "The pleading standards remain 'the same when a motion to dismiss is based on qualified immunity.'" *Guerra v. Castillo*, 82 F.4th 278, 285 (5th Cir. 2023). The question "is whether the complaint pleads facts that, if true, would permit the inference that Defendants are liable under [Section] 1983[,] and would overcome their qualified immunity defense." *Id.* (second alteration in original).

Qualified immunity is irrelevant to some of Rogers's claims. It "does not extend to state officials sued in their official capacities." *Mangaroo v. Nelson*, 864 F.2d 1202, 1208 (5th Cir. 1989); *Walker v. Howard*, 517 F. App'x 236, 237 (5th Cir. 2013). And the Foundation and Alamo Trust do not assert the defense. Wilson and Andrade briefly argue that it applies to them. But "[a] defendant may act under color of state law for the purposes of [Section] 1983 without receiving

the related protections of qualified immunity." *Brewer v. Hayne*, 860 F.3d 819, 823 (5th Cir. 2017). To "determin[e] whether a private individual performing a government function is entitled to qualified immunity, [courts] consider whether the service performed was of the type protected at common law at the time [Section] 1983 was passed in 1871 and whether granting immunity in a given case is consistent with the policies underlying [Section] 1983." *Id.* Wilson and Andrade do not acknowledge that standard, let alone make an argument under it. They have thus forfeited such an argument at this stage. *See Wilson v. City of Mission, Tex.*, No. 7:18-CV-00399, 2020 WL 2079359, at *10 (S.D. Tex. Apr. 29, 2020) ("[A]rguments asserted without citation to authority or left undeveloped are waived.").

So the only claims that might be subject to qualified immunity are Rogers's individual-capacity claims against Patrick and Buckingham. But, as noted above, it has been clearly established since at least 2022 that a plaintiff has the right "to be free from governmental officials' exerting their power or influence over a third-party employer to cause the plaintiff to be [subject to adverse employment action] for exercising his First Amendment rights." *Fletcher*, 26 F.4th at 282–83. Patrick and Buckingham allegedly did just that.

Defendants do not dispute that it is clearly established that constructive discharge is an adverse employment action. And although no party has identified binding precedent directly stating that withholding a severance offer is an adverse employment action, on-point authority is not required. *See Mullenix v. Luna*, 577 U.S. 7, 12 (2015) ("We do not require a case directly on point . . . ."). It is enough if "existing precedent [has] placed the statutory or constitutional question beyond debate." *Id.* That is the case here because, as explained above, withdrawal of a severance offer is closely analogous to refusal to promote; the withdrawal of Rogers's severance offer was sufficiently "punitive" to constitute a sanction; and, regardless, the withdrawal certainly involved

the kind of "important conditions of employment" necessary to show an adverse employment action.

## CONCLUSION

For the foregoing reasons, Patrick's Motion to Dismiss (ECF No. 21) is **GRANTED IN PART AND DENIED IN PART**; Buckingham's Motion to Dismiss (ECF No. 22) is **DENIED**; and the Alamo Defendants' Motion to Dismiss (ECF No. 23) is **GRANTED IN PART AND DENIED IN PART**.

Rogers's official-capacity claims against Patrick are **DISMISSED WITHOUT PREJUDICE** for lack of subject matter jurisdiction. Her claims against the Foundation based on her alleged constructive discharge are **DISMISSED WITHOUT PREJUDICE** for failure to state a claim. Rogers's individual-capacity claims against Patrick, her claims against the Foundation based on the alleged withdrawal of her severance offer, and all of her claims against Buckingham, Andrade, Alamo Trust, and Wilson remain pending.

It is so **ORDERED**.

**SIGNED** this 25th day of August, 2026.

XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE